[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 30, 2009
THOMAS K. KAHN
CLERK

_____

No. 08-14075

_____

D.C. Docket No. 06-80959-CV-LRJ


PROUDFOOT CONSULTING COMPANY,
a Delaware corporation,

                                                    Plaintiff-Appellee,

versus

DERRICK GORDON,

                                                    Defendant-Appellant,


_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(July 30, 2009)

Before BARKETT and FAY, Circuit Judges, and TRAGER,[*] District Judge.

TRAGER, District Judge:

This case arises out of an employment agreement ("Agreement") between appellant Derrick Gordon ("Gordon" or "appellant") and appellee Proudfoot Consulting Company ("Proudfoot" or "Proudfoot North America" or "appellee") that contains a number of restrictive covenants. The Agreement prevents Gordon, for six months after his employment with Proudfoot ends, from working for a direct competitor or client of Proudfoot, contacting Proudfoot's clients and soliciting Proudfoot's employees. The Agreement also bars Gordon from using or disclosing Proudfoot's confidential information and from retaining Proudfoot materials after his employment ends. After Gordon left Proudfoot in June 2006 to work for the Highland Group ("Highland"), a direct competitor, Proudfoot brought suit to enforce the restrictive covenants.

Following a bench trial, the district court held that all of those restrictions ("Restrictive Covenants") were enforceable under Florida law. Based on Gordon's breaches of the Restrictive Covenants, the district court concluded that Proudfoot was entitled to a statutory presumption of irreparable harm. Because Gordon

_____

[*] Honorable David G. Trager, United States District Judge for the Eastern District of New York, sitting by designation.

2

failed to rebut that presumption, the district court entered an injunction against Gordon, preventing him, for six months, from working for Highland and from soliciting Proudfoot's clients and employees. Since the district court's decision was handed down over a year-and-a-half after Gordon began working at Highland, in order to grant this injunctive relief, the district court had to rely on a tolling provision in the Agreement, which provides that the six-month restrictive period is to be tolled during any period where Gordon is in breach of the non-compete and non-solicitation covenants. The district court found that Gordon's continuous work for Highland, which breached the Agreement's bar against employment with a direct competitor, justified tolling the six-month restrictive period. In addition to granting injunctive relief, the district court also awarded Proudfoot attorney's fees and $1,659,000 in damages stemming from a project performed by Highland for Bombardier, a Proudfoot client that Gordon both worked on and helped solicit for Highland.

On appeal, Gordon seeks to reverse the damages award. In addition, although Gordon has not appealed the attorney's fees award, he challenges the validity of the injunction, which has expired, in the hope of revisiting the attorney's fees award before the district court if the injunction is invalidated. For the reasons explained below, we conclude that the injunction was not improper. However, we

reverse the damages award. Proudfoot failed to establish that Gordon's solicitation of Bombardier for Highland resulted in Proudfoot's loss of the project that was the basis of the damages award.

## I. BACKGROUND

### (1)

Proudfoot North America is a management consulting firm that provides consulting services to improve clients' work processes by eliminating redundancies, streamlining processes and implementing systems of management. Proudfoot North America, which is headquartered in West Palm Beach, Florida and has offices in Atlanta and New York, operates and markets its services in the United States and Canada and has clients located in both countries. Management Consulting Group ("Proudfoot Global"), a publicly-traded company based in the United Kingdom, is the parent company of a number of Proudfoot affiliates across the globe, including an affiliate in Europe ("Proudfoot Europe") as well as Proudfoot North America.

Gordon worked at Proudfoot North America from March 1999 through May 2006. From March 1999 though October 2001, Gordon was a Senior Process Consultant. Process Consultants, who are supervised by a Project Manager, work directly with a client's first- and second-level supervisors. From October 2001

through January 2005, Gordon was a Project Manager. As a Project Manager, Gordon had overall responsibility for a specific client project and supervised five to ten Process Consultants. Project Managers are responsible for achieving results for a client, obtaining repeat business from a client and convincing a client to provide referrals and to serve as a reference.

From January 2005 through May 2006, Gordon worked as a Project Director. As a Project Director, he supervised two to four Project Managers at a time and was responsible for multiple client projects. A Project Director is responsible for managing client relationships and is the most senior Proudfoot employee who interacts with individual clients on an ongoing basis. Project Directors report to the Vice President of Business Delivery.

On April 18, 2006, Gordon was offered a position by Highland, an operational management consulting firm that competes directly with Proudfoot. After Gordon tendered his resignation from Proudfoot on May 1, 2006, Proudfoot CEO Luiz Carvalho ("Carvalho") met with Gordon. At this meeting, Gordon lied to Carvalho about the offer that he had received, stating that the offer was from a private equity firm and never mentioning Highland. After Carvalho offered Gordon the position of Vice President of Business Delivery for Proudfoot Europe, Gordon accepted that position and withdrew his resignation. Vice President of

5

Business Delivery is a critical position that has ultimate responsibility for all aspects of delivering services to clients and for defining strategy for each client account. While in this position, Gordon's office was located in London.

On June 12, 2006, Gordon again notified Proudfoot that he was resigning. This time he did not withdraw his resignation, which was voluntary and became effective on June 23, 2006. Gordon never informed Proudfoot that he was leaving to work for Highland.

During his tenure at Proudfoot North America, Gordon worked on many client projects in the United States and on a client project in Mexico. The district court found that Gordon traveled to a Proudfoot client project in Canada.[1] The district court also found that during Gordon's tenure at Proudfoot North America, his "territory" included the United States and Canada.[2]

At Proudfoot, Gordon had access to, and received, information in various forms about specific Proudfoot clients and projects, as well as about Proudfoot's

---

[1] Gordon argues that this trip, which occurred in 1999, was part of his orientation and that he did not do any work on that project.

[2] Although Gordon maintains on appeal that his territory did not include Canada, at trial, he was impeached with a deposition answer where he admitted that prior to being transferred to Europe, he "covered a territory that included the United States, Canada and Mexico." At trial, Gordon tried to explain that this only meant that he worked for Proudfoot North America, whose territory encompassed those countries. It should, however, be noted that Gordon stated during trial that at Proudfoot, "we would have meetings on a weekly basis where we would literally go through and discuss every project within North America, and I was aware of all the projects . . . ."

6

operations generally. Gordon received hard copies of a number of Proudfoot materials, including training manuals and videos from the numerous training sessions he attended, a list of Proudfoot Europe's employees, business cards of Proudfoot clients for whom he had worked, and a Proudfoot employee newsletter. Gordon retained these materials after leaving Proudfoot, but insisted that he did so unintentionally.

While at Proudfoot, Gordon also had access to information beyond the specific hard-copy materials that he retained. He had access to information about Proudfoot's clients, including pricing information.[3] Moreover, during his tenure as Vice President of Business Delivery for Proudfoot Europe, Gordon conducted high-level reviews of the company's client projects in Europe and received information about those projects. In addition, Gordon also had access to information about Proudfoot's operations. At trial, he admitted, generally, that he had "access to confidential information about Proudfoot's business." Moreover, the district court concluded that Gordon was exposed to Proudfoot's "methodology

_____

[3] It is somewhat unclear from Gordon's trial testimony whether the pricing information that he had access to was relevant only to specific clients or whether this information had broader relevance to any potential client that Proudfoot might seek to obtain. Carvalho, however, testified that Proudfoot employees have access to "pricing mechanisms," which would appear to be generally applicable.

for [providing] operational management consulting services" as well as to Proudfoot's "products and offerings and tools."

In addition, during his tenure at Proudfoot, Gordon accessed and downloaded information from the Knowledge Management database, a project database that contains information about all of Proudfoot's client projects, from around the world, dating back to the 1980s and other information about Proudfoot's business operations. Tools, studies, questionnaires and diagnostics from past projects are included in the Knowledge Management database so that Proudfoot employees can use that information "for other clients in similar situations anywhere around the world."

On June 26, 2006, Gordon started working at Highland. Highland, whose headquarters are located in the United States, does business and maintains offices in North America and Europe. At Highland, Gordon served as a Project Manager responsible for day-to-day delivery and execution of client projects and the direct supervision of process consultants. Gordon was promoted to Director of Operations in June 2007.

At Highland, Gordon worked on projects for different clients; one of those clients was Bombardier, who was also a client of Proudfoot Europe. In September 2006, Highland assigned Gordon to a project for Bombardier called "Bombardier

Interiors." In February 2007, eight months after leaving Proudfoot, Gordon helped solicit a different Bombardier project for Highland called "Bombardier Logistics." Gordon was the Project Manager for that project until his promotion in June 2007.[4] In addition to his specific client assignments, in the fall of 2006, Gordon was given the responsibility of training other Highland employees and coordinating the development of written training materials. Gordon performed this function for approximately "eight weeks." Also, around the time of trial, Gordon was put in charge of developing a new model for reviewing the operations phase of Highland's client projects.

**(2)**

The Agreement Gordon signed with Proudfoot contains four Restrictive Covenants. Three of the Restrictive Covenants are found in a "Noncompetition and Nonsolicitation" clause, which restricts Gordon from engaging in certain activities for six months after his employment with Proudfoot ends ("six-month restrictive period"). First, the non-compete provision prevents Gordon from "[s]erv[ing] as an employee . . . or consultant for . . . any business which is a Direct Competitor" ("competitor non-compete covenant" or "competitor non-

---

[4] The details of Gordon's work for, and solicitation of, Bombardier are addressed more fully in the discussion of Gordon's appeal of the damages award.

compete clause").  "Direct Competitor" is defined as "any person or entity engaged in the business of providing professional services to advise clients as to the design and installation of systems and processes to improve the productivity and efficiency of their business operations."  Second, the non-compete provision also prevents Gordon from "[s]erv[ing] as an employee . . . or consultant for . . . any business which is . . . a Client" ("client non-compete covenant" or "client non-compete clause").  "Client" is defined as "a person or organization, which at any time within the three years preceding the date of termination of Employee's employment has received a proposal or bid from [Proudfoot], or has received any services from [Proudfoot]. . . ."  Third, under a non-solicitation provision, Gordon is prohibited from "contact[ing] any client of [Proudfoot]" or soliciting any Proudfoot employees ("non-solicitation covenant" or "non-solicitation clause").  The Agreement also provides that the six-month restrictive period "shall be tolled during any period in which Employee is in violation of this Noncompetition and Nonsolicitation provision."

In addition, fourth, the Agreement also includes a clause concerning confidential information ("confidential information clause") that is distinct from the Noncompetition and Nonsolicitation clause.  The confidential information

clause defines what constitutes confidential information[5] and requires Gordon to return all Proudfoot documents and materials to the company upon the termination of his employment.  Unlike the six-month time limit of the other three covenants described above, this clause prevents Gordon from disclosing or using this information "at all times after the termination of [his] employment."

## II.  PROCEDURAL HISTORY

On August 23, 2006, Proudfoot filed suit against Gordon in Florida Circuit Court seeking injunctive relief and alleging breach of contract.  Gordon, a citizen

---

[5]  The Agreement defines "confidential information" as

(i) Client and prospective client names, needs, structures, organizations, data profiles, preferences, attitudes, idiosyncracies, and all other information concerning the business and operations of clients of the Company;

(ii) All of the Company's applications, operating systems, techniques, methods, procedures and approaches, including diagnostic instruments, drawings, designs, graphs, charts, tapes, diagrams, films, specifications and software;

(iii) The Company's fee structures, and procedures and arrangements and all financial information pertaining to the Company;

(iv) Inventions, and research and development activities of the Company; and

(v)  All other materials and information concerning the Company's business and its conduct which the Company treats as proprietary and confidential which is not generally known to others.

11

of Georgia, removed the case to the United States District Court for the Southern District of Florida on the basis of diversity jurisdiction. Pursuant to the consent of the parties, the case was tried in January 2008 before Magistrate Judge Linnea R. Johnson ("district court"). After a three-day bench trial, the parties submitted proposed findings of fact and conclusions of law ("Proposed Findings"). Proudfoot's Proposed Findings offered three alternative damages proposals, which sought an award based on: (1) Highland's profits for all projects that Gordon worked on; (2) Highland's profits for the Bombardier project that Gordon helped solicit; or (3) the total compensation Gordon received while working at Highland.

On April 15, 2008, the district court adopted, with few modifications, Proudfoot's Proposed Findings and Proudfoot's second damages proposal. That same day, the district court entered a final judgment awarding Proudfoot $1,659,000 in damages and enjoining Gordon, for six months, from: (1) working in North America or Europe for Highland or any other direct competitor; (2) contacting any client of Proudfoot; and (3) soliciting any Proudfoot employees. Gordon was also enjoined from possessing, using or disclosing any confidential information of Proudfoot and was directed to return any such information in his possession to Proudfoot. The portion of the injunction preventing Gordon from using or disclosing Proudfoot's confidential information did not include a time

12

limitation.  On appeal, Gordon challenges the district court's grant of the injunction and the damages award.

After Gordon filed a notice of appeal, the district court entered a separate judgment against Gordon, awarding Proudfoot $335,050.55 in attorneys' fees and costs under Fla. Stat. § 542.335(1)(k).  No notice of appeal was filed from this award.

### III.  DISCUSSION

A.  <u>Standard Of Review</u>

After a bench trial, we review the district court's conclusions of law <u>de</u> <u>novo</u> and the district court's factual findings for clear error.  <u>Renteria-Marin v. Ag-Mart Produce, Inc.</u>, 537 F.3d 1321, 1324 (11th Cir. 2008).  "A factual finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"  <u>Morrissette-Brown v. Mobile Infirmary Med. Ctr.</u>, 506 F.3d 1317, 1319 (11th Cir. 2007) (quoting <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 573, (1985)).  "The clear error standard does not change when the district court adopts verbatim the findings of one of the parties, but the practice is strongly disapproved."  <u>Lykes Bros., Inc. v. U.S. Army Corps of Eng'rs</u>, 64 F.3d 630, 634 n.4 (11th Cir. 1995).

B. Enforceability And Breach Of The Restrictive Covenants

   1. The Relevant Law – Fla. Stat. § 542.335

In 1996, Florida adopted Fla. Stat. § 542.335, which "contains a comprehensive framework for analyzing, evaluating and enforcing restrictive covenants contained in employment contracts." Envtl. Servs., Inc. v. Carter, 9 So.3d 1258, 1262 (Fla. Dist. Ct. App. 2009). For a restrictive covenant to be valid, "[t]he person seeking enforcement of [the] restrictive covenant shall plead and prove the existence of one or more legitimate business interests justifying the restrictive covenant." Fla. Stat. § 542.335(1)(b). Section (1)(b) of the statute enumerates a non-exhaustive list of "legitimate business interest[s]." Among these are: (1) "[v]aluable confidential business or professional information that otherwise does not qualify as trade secrets"; (2) "[s]ubstantial relationships with specific prospective or existing customers, patients, or clients"; and (3) "[e]xtraordinary or specialized training."

In addition, to be enforceable, restrictive covenants must be reasonable with regard to time, area and line of business. Fla. Stat. § 542.335(1). Once an employer establishes a prima facie case that the contractually specified restraint is "reasonably necessary to protect the legitimate business interest[s] . . . justifying the restriction," the burden of proof shifts to the employee to show that "the

14

contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the established legitimate business interest[s]." Fla. Stat. § 542.335(1)(c).  If the court finds that the "contractually specified restraint is overbroad, overlong, or otherwise not reasonably necessary to protect the legitimate business interest[s]," the court is required to "modify the restraint and grant only the relief reasonably necessary to protect such interest or interests." Id.

"The violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." Fla. Stat. § 542.335(1)(j).  This presumption, however, is rebuttable.  JonJuan Salon, Inc. v. Acosta, 922 So. 2d 1081, 1084 (Fla. Dist. Ct. App. 2006).

2.  The District Court's Decision

The district court found that Proudfoot established three legitimate business interests, a prerequisite under the statute for any form of relief.  These interests are: (1) Gordon's receipt of the information outlined earlier, which the district court found was valuable and confidential; (2) Proudfoot's substantial relationships with specific prospective and existing customers; and (3) the extraordinary and specialized training provided to Gordon.

15

After finding that those interests justified the Restrictive Covenants, the district court had to determine whether the geographic scope of the competitor non-compete covenant was overbroad or otherwise not reasonably necessary to protect Proudfoot's legitimate business interests.[6] At the outset, the district court found that the Agreement provided "in plain fashion, that the covered area is North America and any other territory to which Gordon is assigned during his employment." That finding was erroneous as the competitor non-compete clause in the Agreement contains no such explicit geographic limitation. However, Gordon concedes that because the competitor non-compete covenant did not include a geographic limitation, it was permissible for the district court to supply a reasonable geographic scope. Here, the district court found that, even if the Agreement were silent, North America and Europe would be a reasonable geographic area because Proudfoot conducts its operations in that territory and Gordon was assigned to that territory.

Once the district court determined that the Restrictive Covenants were enforceable and defined the geographic scope of the competitor non-compete clause, the district court concluded that Gordon breached all four Restrictive

---

[6] The district court never discussed a geographic limitation for the covenants that restrict Gordon from contacting or working for Proudfoot clients.

16

Covenants. The district court found that Gordon's employment by Highland breached the competitor non-compete covenant. The district court also found that Gordon's solicitation of Bombardier and his work on projects for Bombardier violated both the non-solicitation clause and the client non-compete covenant. Finally, the district court determined that Gordon's retention of Proudfoot materials after his employment ended breached the confidential information clause, which required Gordon to return these materials to Proudfoot. Based on these breaches, the district court concluded that Proudfoot was entitled, under Fla. Stat. § 542.335(1)(j) to a presumption of irreparable injury, which the district court found Gordon failed to rebut.

The district court concluded that Gordon's breach of the competitor non-compete covenant, based on his employment with Highland, tolled the six-month restrictive period from the time he began working for Highland in June 2006 through the date of the district court's judgment. The district court used this violation to toll not only the six-month restrictive period for the competitor non-compete covenant, but also the six-month restrictive periods for the client non-compete covenant and the non-solicitation clause.[7] This tolling allowed the

_____

[7] Although the district court also found that Gordon breached the client non-compete clause and the non-solicitation covenant by working on a project for Bombardier in September 2006 and by working on, and soliciting, a project for Bombardier in February 2007, the district

17

district court both to grant the injunction and to award Proudfoot damages, which were based on Gordon's work for, and solicitation of, Bombardier in February 2007 and occurred more than six months after Gordon left Proudfoot.

In attacking the injunction and damages award, Gordon argues that the competitor non-compete clause should not have been enforced because the training he received did not rise to the level of a legitimate business interest and because he did not intentionally retain any confidential Proudfoot materials. Gordon also contends that, even if the competitor non-compete covenant were enforceable, his work for Highland in Canada should not have been considered a violation of that covenant because Canada should not have been included in the geographic scope of that covenant. Finally, Gordon asserts that even if he breached the competitor non-compete clause, that breach should have been disregarded because it was not intentional.

Although we have doubts about some of the district court's factual findings and legal conclusions, Gordon's arguments ultimately do not persuade us that the district court erred in concluding that: (1) the confidential information which Gordon had was a legitimate business interest and justified the competitor non-

court did not explicitly rely on those breaches as a basis for tolling the six-month restrictive period.

compete covenant; (2) Gordon's work for Highland in Canada breached that covenant; and (3) Gordon's breach could be used to toll the six-month restrictive period even if that breach was not intentional.  Accordingly, the grant of injunctive relief was not improper.[8]

### 3. Enforceability Of The Competitor Non-Compete Covenant

The district court found that all three of Proudfoot's legitimate business interests – confidential information, training and client relationships –  justified the competitor non-compete clause.  Although Gordon argues that Proudfoot failed to establish a legitimate business interest in his training, it is

---

[8]  Except for the portion of the injunction restricting the use or disclosure of Proudfoot's confidential information, which has no temporal limitation, the remainder of the injunction, which ran for six months, has long since expired.  It is unclear if the attorney's fees award would prevent Gordon's appeal of the injunctive relief from being moot, particularly as Gordon has not appealed that award.

Nonetheless, some of the same issues, such as, for example, the enforceability of the competitor non-compete clause and the tolling of the six-month restrictive period, underlie both the injunction and the damages award.  Therefore, those issues are not moot.  See Medtronic, Inc. v. Janss, 729 F.2d 1395, 1398-99 (11th Cir. 1984) (holding that even though injunction had expired, issues concerning enforceability and breach of restrictive covenants were not moot where damages claim, which was bifurcated from trial of injunctive relief, was still pending).

Although the question of whether the district court was correct in enjoining Gordon from using or disclosing Proudfoot's confidential information for an indefinite period of time is not moot, Gordon has not challenged that determination on appeal.  It should, however, be noted that similar covenants regarding confidential information have been found to be presumptively unreasonable under Fla. Stat. § 542.335(1)(d)1 where the restriction has a duration of more than two years.  See Re/Max Intern., Inc. v. Citimaxx Corp., No. 08-cv-2554, 2009 WL 1883035 (M.D. Fla. Jun 30, 2009).

19

unnecessary to address that challenge because Proudfoot was only required to establish one legitimate business interest to justify the non-compete covenant and we conclude that the district court did not err in finding this covenant was justified by, and reasonably necessary to protect, Proudfoot's legitimate business interest in its confidential information.[9]

---

[9] We doubt that Proudfoot's interest in Gordon's training could justify the competitor non-compete clause. Proudfoot did not establish that Gordon's training went "beyond what is usual, regular, common, or customary" in the consulting industry. Hapney v. Cent. Garage, Inc., 579 So. 2d 127, 132 (Fla. Dist. Ct. App. 1991), disapproved on other grounds, Gupton v. Village Key & Saw Shop, Inc., 656 So. 2d 475 (Fla. 1995). In addition, Gordon's training, which appears to have involved general management, sales and consulting skills, would only seem to be "specialized" in the sense that it was geared to Proudfoot's own methodologies, practices and procedures.

We also have doubts whether Proudfoot's interest in its substantial client relationships would justify the competitor non-compete clause. Proudfoot's legitimate business interest in its client relationships includes the relationships that Gordon established with Proudfoot clients as well as the client-specific confidential information known to Gordon. Although the covenants that prevent Gordon from contacting or working for Proudfoot clients would be reasonably necessary to prevent Gordon from exploiting any relationships that he developed with Proudfoot clients, we do not see why the broad competitor non-compete covenant, which bars Gordon from working for a competitor irrespective of which clients he is serving, would be reasonably necessary to protect Proudfoot's interest in the relationships that Gordon developed with its clients. See Envtl. Servs., Inc. v. Carter, 9 So.3d 1258, 1263-64 (Fla. Dist. Ct. App. 2009) (finding that non-compete agreement that prevented former employee from performing services for customers of former employer "with whom the Employee had any business-related contact . . . during his/her employment" was justified by former employer's legitimate business interest in its substantial relationships with those customers). Moreover, a broad prohibition against work for a competitor may not be reasonably necessary to protect client-specific confidential information known to an employee if restrictions that prevent the employee from contacting, or working for, those clients would be sufficient to protect that information. Gordon, however, has not contended that his access to confidential information was limited to information that was only relevant to specific clients.

20

The district court found that, while at Proudfoot, Gordon received information about Proudfoot's clients and business operations, including training materials, pricing information, information about Proudfoot's methodology for providing operational management consulting services and information about Proudfoot's products, offerings and tools. The district court concluded that this information constituted "valuable confidential business information" and that "the confidentiality of that . . . information is at risk so long as [Gordon] is employed by Proudfoot's direct competitor."[10] Citing <u>Autonation v. O'Brien</u>, 347 F. Supp. 2d 1299 (S.D. Fla. 2004), the district court reasoned that "when an employee has access to confidential business information crucial to the success of an employer's business, that employer has a strong interest in enforcing a covenant not to compete."

Gordon does not dispute that he received valuable confidential information during his tenure at Proudfoot.[11] His only argument related to Proudfoot's

_____

[10] The district court found that Gordon's "employment by a direct competitor, no matter in what capacity, necessarily endangers Proudfoot's confidential information." Although this broad statement suggests that the district court believed that Gordon's position at Highland was irrelevant, it must be stressed that, prior to making this statement, the district court had previously found that Gordon was in a position at Highland "that competes" with Proudfoot.

[11] The district court's findings regarding the confidentiality and value of the information that Gordon had access to are somewhat troubling. For example, the district court found, without further explanation, that Proudfoot's "valuable confidential business information" included the mere identity of Proudfoot's clients as well as the pricing terms related to the company's projects.

21

confidential information is that he did not intentionally breach the confidentiality

clauses's restriction against the retention of Proudfoot materials because he

unknowingly kept certain Proudfoot materials after leaving Proudfoot and never

used or disclosed those materials while working at Highland.

Gordon mistakenly assumes that Proudfoot's interest in its confidential

information would only have justified the enforcement of the competitor

non-compete covenant if Proudfoot could establish that he breached the

confidential information clause by improperly retaining and using Proudfoot

materials.  Gordon, however, ignores the fact that the information that he received

was clearly not limited to the physical materials he retained.  Gordon admitted that

he had access to confidential information about Proudfoot's business, including

---

Such information may not be sufficient to justify a restrictive covenant. See Deloitte & Touche USA LLP v. Lamela, No. Civ. A. 1542-VCP, 2007 WL 1114075, at *7-8 (Del. Ch. Apr. 6, 2007) (rejecting, under Fla. Stat. § 542.335, former employer's attempt to apply non-solicitation clause to certain clients where employee did not have any relationship with those clients and former employer failed to establish it had any special pricing arrangement with those clients and did not allege "with any specificity that [the employee] had access to nonpublic pricing information or strategies of [the former employer] that would give [the employee] an unfair competitive advantage in dealing with" those clients).  The district court's findings illustrate why verbatim adoption of one party's proposed findings are "strongly disapproved." Lykes Bros., 64 F.3d at 634 n.4.  That said, at trial, Gordon admitted that Proudfoot's pricing information and the identity of Proudfoot's clients were confidential.  Moreover, before the district court, Gordon did not contest that he had access to confidential information while at Proudfoot and instead attempted to argue that Proudfoot's interest in its confidential information did not justify the Restrictive Covenants because there was no evidence that he ever used that information or misappropriated any confidential Proudfoot materials.

pricing information. In addition, Gordon was exposed to Proudfoot's methodology for providing operational management consulting services as well as to Proudfoot's products, offerings and tools. Although the testimony on these points could have been more detailed, Gordon does not challenge the district court's findings on these points and does not contest that he could use this information in his new position at Highland to compete unfairly against Proudfoot. Even if it is assumed that Gordon's accidental retention of Proudfoot materials should not be considered a material breach of the confidential information clause, the district court's conclusion that Gordon's employment with Highland endangered the information that he received at Proudfoot (a conclusion that Gordon does not challenge) provides a basis to enforce the competitor non-compete covenant.[12]

---

[12] It is unclear under Florida law when confidential information will justify a broad restriction that prevents an employee from working for a competitor. There are two potentially conflicting strands of authority on this issue. Under the approach adopted by the district court, such covenants should be enforced where an employee is in a position at her new employer to use her former's employer's confidential information. Other authorities suggest a second, slightly different standard that would enforce such covenants where it is established that disclosure of the confidential information by the employee would be inevitable in the employee's new position.

In following the first approach, the district court relied on an earlier federal case, Autonation v. O'Brien, 347 F. Supp. 2d 1299, 1305-08 (S.D. Fla. 2004), which held that the employee's access to confidential information, which included the former employer's strategic plan, market analyses, forecasts, sales trends, and best practices, justified a restriction against work for a competitor where the employee was in a position at his new employer to use that information to unfairly compete against his former employer. Some Florida state court decisions also appear to have adopted this approach. See Open Magnetic Imaging, Inc. v. Nieves-Garcia, 826 So. 2d 415, 417, 419 (Fla. Dist. Ct. App. 2002) (per curiam) (holding that physician relations representative's knowledge of confidential database of physicians, which was created as part of "confidential

23

Moreover, nothing raised by Gordon in his argument regarding the Proudfoot

strategic marketing plan," was a legitimate business interest that justified non-compete clause where employee was hired by competitor as a marketing representative); Austin v. Mid State Fire Equip. of Cent. Florida, Inc., 727 So. 2d 1097, 1098 (Fla. Dist. Ct. App. 1999) (holding that restriction against work for a competitor was not reasonably necessary to protect pricing information known to the employee because the employee, who worked as a service technician, "does not set up service runs or set prices; he merely executes the service runs as instructed by his employer").

A law review article co-authored by the Senate sponsor of Fla. Stat. § 542.335 implies that a second standard should govern. See John A. Grant & Thomas Steele, Restrictive Covenants: Florida Returns to the Original "Unfair Competition" Approach to the 21st Century, 70 Fla. B.J. 53, 53-56 (Nov. 1996) (hereinafter "Grant & Steele"). Grant & Steele, which has been cited by numerous Florida decisions, see, e.g., Univ. of Florida, Bd. of Trustees v. Sanal, 837 So. 2d 512, 516 (Fla. Dist. Ct. App. 2003), suggest that in determining whether an employee's knowledge of confidential information justifies a restriction against work for a competitor, courts should look to the definition of threatened misappropriation used in trade secrets law. See Grant & Steele at 54-55, 54 n.15; Fla. Stat. §§ 688.002-688.003. As other jurisdictions have recognized, under trade secrets law, threatened misappropriation can be enjoined where, based on the details of the trade secrets at issue and the employee's position at the new employer, disclosure of the trade secrets would be inevitable. See Pepsico, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995) (enjoining employee from working for competitor based on inevitable disclosure of trade secrets even though employee did not enter into non-compete agreement); Payment Alliance Intern., Inc. v. Ferreira, 530 F. Supp. 2d 477, 482 (S.D.N.Y. 2007) (enforcing restriction against work for a competitor and noting factors to consider in determining whether there is a risk of inevitable disclosure). One Florida decision enforced a non-compete agreement based on this theory of inevitable disclosure. Fountain v. Hudson Cush-N-Foam Corp., 122 So. 2d 232, 234 (Fla. Dist. Ct. App. 1960) (finding that employee's "knowledge of the trade secrets would be so entwined with his employment" that "it would seem logical to assume that his employment by a competitor . . . would eventually result in a disclosure of this information").

Although the principle of inevitable disclosure would appear to impose a higher standard than the approach set out in O'Brien, it is unclear if, in practice, the application of those two standards would produce different results. It is, however, unnecessary for us to resolve this uncertain issue of Florida law because Gordon, whose argument on appeal addresses only the materials he retained, has not challenged the district court's reliance on O'Brien or the district court's findings about the other confidential information that he received.

24

materials that he retained undermines that conclusion.[13]  As such, Gordon has failed to show that the district court clearly erred in finding that Proudfoot's confidential information constituted a legitimate business interest that justified the competitor non-compete covenant.

4.  <u>Geographic Scope Of The Competitor Non-Compete Covenant</u>

Gordon asserts that Canada should have been excluded from the geographic scope of the competitor non-compete covenant and that, if excluded, there would

_____

[13]  A few matters raised by Gordon are potentially relevant to the issue of whether the confidential information he received justified enforcement of the competitor non-compete clause. First, Gordon cites <u>Johnson Controls, Inc. v. Rumore</u>, No. 07-cv-1808, 2008 WL 203575 (M.D. Fla. Jan 23, 2008).  However, <u>Johnson Controls</u> refused to enjoin an employee with confidential information from working for a competitor because his new position was located outside of the non-compete covenant's geographic scope.  Thus, <u>Johnson Controls</u> is consistent with the approach taken in <u>O'Brien</u> and is factually distinguishable from the instant case.  Second, as discussed in n.12, even Grant & Steele, on whom Gordon relies, acknowledge that threatened disclosure of confidential information can justify the enforcement of a restrictive covenant. Third, to the extent that Gordon suggests that there must be evidence that he intended to use Proudfoot's confidential information, that argument fails to persuade us that the competitor non-compete covenant was not enforceable.  Both of the approaches outlined in  n.12 appear to focus on objective facts regarding the employee's new position and the confidential information at issue.  See <u>AutoNation v. Maki</u>, No. 03-18896 CACE (03), 2004 WL 1925479, at *5 (Fla. Cir. Ct. Aug. 25, 2004) (stating that analysis of whether an employee has the ability to use confidential information to compete unfairly against a former employer is "an objective one"), <u>aff'd</u>, 895 So. 2d 453 (Fla Dist. Ct. App. 2005) (per curiam); <u>Payment Alliance Intern.</u>, 530 F. Supp. 2d at 482 (stating that "even if [defendant employee] acted with the best of intentions, 'he may unintentionally transmit information gained through his association with [his former employer] during his day to day contact' with his new employer" (quoting <u>Global Telesystems, Inc. v. KPNQwest, N.V.</u>, 151 F. Supp. 2d 478, 482 (S.D.N.Y. 2001))).  Even if Gordon's subjective intent were considered, given the district court's findings regarding Gordon's deception during his departure from Proudfoot, one could doubt Gordon's willingness to faithfully abide by the restrictions in the confidential information clause.  See <u>Pepsico</u>, 54 F.3d at 1270-71 (holding that district court did not abuse its discretion in finding that employee's lack of candor regarding acceptance of new job demonstrated employee's willingness to misuse former employer's trade secrets).

25

be no breach of the competitor non-compete covenant. In arguing for the exclusion of Canada, he points out that Proudfoot's complaint limited the geographic scope of that covenant to the United States and urges that even apart from the complaint, including Canada was not reasonably necessary to protect Proudfoot's business interests and, therefore, an exclusion covering Canada should not be enforceable.

Gordon claims that the inclusion of Canada is critical because he testified that, during the first six months of his tenure at Highland, he worked exclusively in Canada. If this conduct were not a breach of the competitor non-compete covenant, Gordon contends that the six-month restrictive period should not have been tolled. Because this tolling was necessary to both the grant of the injunction and the damages award, Gordon urges that both the injunction and the damages award were not valid.[14]

---

[14] Proudfoot argues that even if Canada were excluded from the geographic scope of the competitor non-compete covenant, Gordon's company-wide work for Highland (such as his training role) would still constitute a breach of the competitor non-compete covenant even if Gordon was physically located in Canada when he performed that work because it benefitted Highland in the United States. Given that Gordon had certain company-wide duties, his mere physical situs may not be dispositive. However, because we conclude that the district court did not err in including Canada in the geographic scope of the competitor non-compete clause, it is unnecessary to address this point.

26

a. <u>Geographic Scope Alleged In Proudfoot's Complaint</u>

Gordon argues that Proudfoot should be bound by the allegation in its Verified Complaint that the geographic scope of the competitor non-compete covenant is limited to the United States.[15] When Gordon raised this issue at trial during an oral motion for judgment on partial findings, Proudfoot's counsel responded that the pre-trial stipulation expanded the scope of the territory outlined in the complaint.[16] After denying Gordon's motion, the district court explicitly stated that the impact of the pre-trial stipulation on the complaint was still an open issue. However, in his Proposed Findings, Gordon never argued that the allegations in Proudfoot's complaint conclusively determined that the competitor non-compete

---

[15] If Gordon were to prevail on this argument, both Canada and Europe would have to be excluded from the geographic scope of the competitor non-compete covenant. It should be noted that Gordon also argues that the geographic scope of the competitor non-compete clause should not have included Europe because only Proudfoot Europe operates in Europe and neither Proudfoot Europe nor Proudfoot Global are parties to this action. Gordon first raised this argument in a motion under Federal Rules of Civil Procedure 52(b) and 59(e) after the district court issued its Findings of Fact and Conclusions of Law. This motion also argued that Proudfoot should not have been able to recover damages based on Gordon's solicitation of Bombardier because Bombardier was only a client of Proudfoot Europe. The district court, which interpreted Gordon's motion as raising a standing argument, denied the motion, finding that: (1) Gordon waived this argument under Rules 52(b) and 59(e); (2) Gordon waived this argument under Florida substantive law; and (3) Gordon's argument failed on the merits. On appeal, Gordon contests the latter two rationales, but raises no argument challenging the district court's finding of waiver under Federal Rules 52(b) and 59(e). As such, we decline to address Gordon's challenges to the district court's alternative grounds for denying the motion.

[16] In the Joint Pre-Trial Stipulation, Proudfoot's "Statement of the Case" asserts that "Gordon was employed by Proudfoot from 1999 to 2006 and worked primarily in North America."

covenant's geographic scope did not encompass Canada. Moreover, not only did the evidence at trial include admissions by Gordon that his territory included Canada and that he attended weekly meetings that discussed every project in North America, but Gordon has not even argued that the allegation in Proudfoot's complaint prejudiced him either during discovery or at trial. The trial court was, therefore, fully justified in relying on the evidence offered rather than on what clearly appeared to be a mistake in Proudfoot's pleadings.

      b.  <u>Reasonableness Of The Geographic Scope Of The Competitor Non-Compete Covenant</u>

"Whether a non-compete covenant is reasonable or overly broad is a question of fact for the trial court." <u>Whitby v. Infinity Radio Inc.</u>, 951 So. 2d 890, 897 (Fla. Dist. Ct. App. 2007) (holding that trial court erred in granting summary judgment without conducting an evidentiary hearing to hear and receive evidence regarding covenant's reasonableness and scope and noting that trial court had previously assured employee that she would be allowed to present such evidence). As explained below, the district court did not clearly err in including Canada in the geographic scope of the competitor non-compete.

As an initial matter, we reject Gordon's argument that Proudfoot failed to show that it competes in the Canadian market because no evidence was introduced

28

identifying specific Proudfoot clients in Canada.  Carvalho, Proudfoot's CEO, testified that Proudfoot has clients "all over" the United States and Canada, and markets itself throughout both countries.  Aside from the testimony of Carvalho, Gordon admitted that he: (1) visited one Proudfoot client project in Canada; (2) "covered a territory that included the United States, Canada and Mexico"; and (3) attended weekly meetings that discussed Proudfoot's projects in "North America."  Notably, Gordon offered no contrary evidence suggesting that Proudfoot does not compete in the Canadian market.

With regard to the issue of the appropriate geographic scope, Gordon's sole argument related to Proudfoot's confidential information is that there was no evidence that Proudfoot's Knowledge Management database contained any information about any specific Canadian clients, and that, even if it did, there was no evidence he accessed any such information.  Underlying Gordon's argument is the assumption that the confidential information he received at Proudfoot is relevant only to specific clients and to the United States market.  However, if a restriction preventing Gordon from working for a direct competitor anywhere in the United States was reasonably necessary to protect the confidential information Gordon received, a point that Gordon does not contest, it is unclear why that information would not be equally relevant to the Canadian market.  Even if

29

Gordon never accessed confidential information about specific Canadian clients[17], Gordon points to no evidence showing that the confidential information he did receive was only relevant to the United States and could not be used by a competitor to compete unfairly against Proudfoot in the Canadian market. As such, we cannot say that the district court clearly erred in including Canada in the geographic scope of the competitor non-compete covenant. See AutoNation v. Maki, No. 03-18896 CACE (03), 2004 WL 1925479, at *6, 9 (Fla. Cir. Ct. Aug. 25, 2004) (enjoining former employee from competing within 50 miles of his former auto dealership and within 10 miles of any other dealerships owned by his former employer anywhere in the United States where employer established interests in confidential information and training and former employee failed to show that geographic area was overbroad), aff'd, 895 So. 2d 453 (Fla. Dist. Ct. App. 2005) (per curiam); AutoNation v. Hankins, No. 03-14544 CACE (05), 2003 WL 22852206, at *12, 16 (Fla. Cir. Ct. Nov. 24, 2003) (same)[18]; Autonation, Inc.

[17] Although there is no direct evidence that Gordon accessed information about any Canadian clients through Proudfoot's Knowledge Management database, Gordon admitted attending weekly meetings that discussed "every project within North America."

[18] In both Maki and Hankins, the competitors that the former employees went to work for were within fifty miles of the employees' former dealership and within ten miles of other dealerships owned by the former employer. However, the injunctions issued in both those cases did not simply prevent the former employees from working for those specific competitors, but covered the broader geographic territory identified above.

v. O'Brien, 347 F. Supp. 2d 1299, 1307-08 (S.D. Fla. 2004) (finding reasonable geographic restriction preventing employee from "working in any geographic space in which [employer] operates" where employer had interest in confidential information); see also Intermetro Indus. Corp. v. Kent, No. 07-cv-0075, 2007 WL 1140637, at *7 (M.D. Pa. Apr. 17, 2007) ("When the employer's protected interests include information that may be competitively harmful to the employer in any area it competes, then it is reasonable for a non-compete to extend to all areas the employer competes.").

5. Intent To Breach The Competitor Non-Compete Covenant

Gordon also argues that because he had a good-faith reasonable belief that his work for Highland in Canada did not violate the Agreement, the district court should not have relied on his breach of the competitor non-compete covenant in granting the injunction and tolling the six-month restrictive period. According to Gordon, his belief was based on the fact that the competitor non-compete covenant did not explicitly include a geographic scope and that his territory at Proudfoot did not include Canada. In arguing that Proudfoot had to show that he intentionally breached the competitor non-compete covenant, Gordon relies on Milner Voice and Data, Inc. v. Tassy, 377 F. Supp. 2d 1209 (S.D. Fla. 2005), which required the plaintiff to prove that the defendants intentionally breached the restrictive

31

covenants at issue in order to receive injunctive relief, id. at 1214 (citing Sarasota Beverage Co. v. Johnson, 551 So. 2d 503, 508 (Fla. Dist. Ct. App. 1989)).

As an initial matter, Gordon assumes that if Florida law requires an intentional breach of a restrictive covenant in order to grant an injunction, his breach of the competitor non-compete covenant would not trigger the Agreement's tolling provision unless that breach was intentional. However, all of the decisions that Gordon cites to in arguing that Florida law requires an intentional breach discuss intentional breach in the context of parties seeking a preliminary injunction. Although it is unclear if Gordon is correct in assuming that the same standard would also govern the tolling provision, it is unnecessary to resolve that question because we are not persuaded that, in a case governed by Fla. Stat. § 542.335, Florida law would refuse to grant injunctive relief if an employee reasonably believed that his conduct did not violate the restrictive covenants at issue.

Some older Florida intermediate appellate court decisions have stated that a plaintiff must prove that the defendant intentionally breached the restrictive covenant in order to be entitled to a preliminary injunction, see, e.g., Sarasota Beverage, 551 So. 2d at 508 (Fla. Dist. Ct. App. 1989); Silvers v. Dis-Com Secs., Inc., 403 So. 2d 1133, 1136 (Fla. Dist. Ct. App. 1981). Although these decisions refer, in what is arguably dicta, to an "intent" element, none of these decisions

32

have held that a preliminary injunction should be denied if a plaintiff fails to prove that the defendant intentionally breached the restrictive covenant at issue. Nor do these decisions discuss or even mention the notion that a preliminary injunction should be denied if a defendant has a good-faith reasonable belief that his conduct did not violate the restrictive covenant at issue. In addition, these decisions are questionable precedent because they appear to misconstrue prior authority.[19] Moreover, all of the Florida state court decisions referring to an "intent" element were decided under the earlier statute, Fla. Stat. § 542.33(2)(a), which does not apply to the Agreement, Fla. Stat. § 542.331.

Fla. Stat. § 542.335(1)(h), which governs this case, states that "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant." Nothing in the statute suggests that intentional breach is a precondition to relief, and no Florida

---

[19] The first Florida decision to discuss intentional breach in the context of a restrictive covenant is Hunter v. N. Am. Biologicals, Inc., 287 So. 2d 726 (Fla. Dist. Ct. App. 1974). In Hunter, the court affirmed a trial court's refusal to dismiss a complaint that alleged: "(a) [t]he contract (b) [t]he [employee's] intentional direct and material breach thereof [and] (c) [n]o adequate remedy except by injunctive relief." Id. at 728. The court in Hunter held that those "allegations are sufficient to state a cause of action under the statute." Id. Subsequently, in Silvers, 403 So. 2d at 1136, the court stated that "in [Hunter], we said that in order to state a cause of action to enforce a covenant falling within the purview of the statute it was necessary only to allege" the three elements cited in Hunter, including "intentional direct and material breach." (Emphasis added). Thus, Silvers, the first decision to suggest that intent was a required element, clearly misconstrues Hunter, which held that such allegations were sufficient, but never found that they were necessary. We have found no Florida decisions prior to Hunter suggesting that intentional breach must be shown in a restrictive covenant case.

state court decisions under this statute have required plaintiffs to prove intentional breach in order to benefit from the statutory presumption of irreparable injury.[20] The only decision discussing an intent element under the new statute is Milner Voice and Data, Inc. v. Tassy, 377 F. Supp. 2d 1209, 1214 (S.D. Fla. 2005), a federal district court decision that relies on Sarasota Beverage, 551 So. 2d at 508, a case decided under the prior statute.

In addition, Fla. Stat. § 542.335(1)(h) states that:

> A court shall construe a restrictive covenant in favor of providing reasonable protection to all legitimate business interests established by the person seeking enforcement. A court shall not employ any rule of contract construction that requires the court to construe a restrictive covenant narrowly, against the restraint, or against the drafter of the contract.

This section was added to Fla. Stat. § 542.335 in order to "legislatively discard[] prior Florida decisions that invoked and applied such doctrines in restrictive

---

[20] Prior to 1990, Fla. Stat. § 542.33(2)(a) stated that certain restrictive covenants "may, in the discretion of a court of competent jurisdiction, be enforced by injunction." The statute had been interpreted to establish a presumption of irreparable injury upon proof that a valid restrictive covenant had been breached. See Capraro v. Lanier Bus. Prods., Inc., 466 So. 2d 212 (Fla. 1985). In 1990, the statute was amended to only allow a presumption of irreparable injury in specific situations, such as "use of specific trade secrets, customer lists, or direct solicitation of existing customers." All of the decisions referring to an intent element were decided under the pre-1990 version of the statute. When Fla. Stat. § 542.335 was passed in 1996, the sentence "[t]he violation of an enforceable restrictive covenant creates a presumption of irreparable injury to the person seeking enforcement of a restrictive covenant" was included in order to "re-establish[] the pre-1990 amendment rule of [Capraro]." Grant & Steele at 55. The codification of the "pre-rule 1990 amendment rule," however, does not include any reference to an intent requirement.

covenant cases." Grant & Steele at 55. The approach proposed by Gordon, which would not even consider the employer's legitimate business interests, would undermine the policy behind this section. It would make little sense for a court to follow this section's mandate and construe a restrictive covenant broadly only to turn around and conclude that the defendant's breach of the covenant should nonetheless be excused because the defendant may have reasonably interpreted the covenant more narrowly.[21]

Even assuming that intent would, in some circumstances, be relevant under Florida law and that Gordon's belief was reasonable, we fail to see why such a belief should have prevented the district court from using Gordon's breach as a basis to toll the six-month restrictive period and to enjoin prospectively Gordon from working for Highland. The fact that Gordon may have reasonably erred in

---

[21] The cases relied upon by Gordon would survive if this section only applied to monetary damages. There is, however, no indication that this section was intended to be so limited. Such a limitation would make little sense as both the statute and Florida case law acknowledge that injunctions are the primary tool to enforce restrictive covenants against employees. See Fla. Stat. § 542.335(1)(j) ("A court shall enforce a restrictive covenant by any appropriate and effective remedy, including, but not limited to, temporary and permanent injunctions."); Capraro, 466 So. 2d at 213 ("[Although a] "court may award damages for breach of contract . . . the normal remedy is to grant an injunction . . . . because of the inherently difficult, although not impossible, task of determining just what damage actually is caused by the employee's breach of the agreement." (quoting Miller Mechanical, Inc. v. Ruth, 300 So. 2d 11, 12 (Fla. 1974))). Not only can it be difficult to prove damages in such cases, but the fact that defendant employees often have limited funds may render any damages remedy less than adequate.

determining the scope of the competitor non-compete covenant does not grant him a license to work for a competitor in violation of the Agreement.

C. Damages

The district court's damages award is overturned because there was no showing that Gordon's breach caused the claimed damage. The $1,659,000 damages award against Gordon was based on Gordon's contact with Bombardier in February 2007, which led to Highland obtaining the "Bombardier Logistics" project. Although the district court made certain factual findings regarding Bombardier, those findings do not support the award and, in addition, fail to make findings on a number of critical details from the trial testimony. Those details, which appear to be undisputed, are noted below.

During the first half of 2006, Proudfoot was first introduced to, and began its sales process with, Bombardier. Carvalho's testimony suggests that Proudfoot Europe was the specific Proudfoot entity involved in this sales process. Proudfoot submitted a proposal or bid to Bombardier in late May or early June 2006 while Gordon was still employed by Proudfoot.[22] After its proposal was accepted,

---

[22] Because we reverse the damages award, it is unnecessary to address Gordon's alternative argument that Carvalho's testimony regarding the timing of Proudfoot's proposal to Bombardier was insufficient to establish that Bombardier qualified as a "client" under the Agreement.

Proudfoot conducted a business review for Bombardier starting in mid-June 2006. After the business review ended, Bombardier hired Proudfoot to conduct a productivity-related project for Bombardier that included work focusing on lead times, productivity gains and procurement. Carvalho testified that this project was performed in the United Kingdom by Proudfoot Europe. In February 2007, Bombardier interrupted the project, two months prior to its scheduled completion. At trial, Carvalho admitted that Gordon did not work on Proudfoot's project for Bombardier.

While at Highland, Gordon worked on two projects for Bombardier in Canada. In September 2006, Gordon was assigned to a project for Bombardier called "Bombardier Interiors," which had begun prior to Gordon joining Highland. In February 2007, Gordon was personally involved in the "design and discovery" phase of a second project for Bombardier called "Bombardier Logistics." During the "design and discovery" phase, Highland would do an initial analysis for a client in the hopes of convincing the client to hire Highland for an implementation project. Gordon attended all the formally scheduled meetings with Bombardier and all of the meetings where Highland made presentations to Bombardier about the proposed project. At these meetings, Gordon explained the benefits of the proposed project to Bombardier. Bombardier elected to hire Highland for the

proposed project, which ultimately generated $2,600,000 in revenue for Highland. The initial "design and discovery" phase of this second project generated an additional $165,000 in revenue for Highland.

The district court made no findings about the details of either of Highland's projects for Bombardier. At trial, however, Gordon testified that the Bombardier Interiors project involved helping Bombardier pass FAA certification for "burn tests" concerning the interiors of an aircraft. Gordon also testified that the Bombardier Logistics project, which involved a different division at Bombardier that builds different types of aircraft, was similar to the first project in that the primary objective for both projects was "look[ing] at ways in which they could better produce the aircraft to meet FAA guidelines in a faster fashion and mitigate some of the snags that they were having problems with." As noted earlier, the only evidence about Proudfoot Europe's Bombardier project was that it was a productivity-related project that included work focusing on lead times, productivity gains and procurement. Thus, based on this sparse record, it is impossible to determine if Highland's Bombardier projects were even similar to Proudfoot's Bombardier project. Also, there is no evidence suggesting any link between the interruption of Proudfoot Europe's Bombardier project and Highland's "Bombardier Logistics" project.

After finding that Gordon's contact with, and solicitation of, Bombardier in February 2007 violated the non-solicitation clause and client non-compete covenant, the district court concluded that this breach entitled Proudfoot to $1,659,000 in damages, "an amount equal to the profits Gordon helped to generate for Highland from [the 2007] Bombardier project . . . ." The district court explained that "[s]uch ill-gotten profits are inextricably linked to Gordon's breach of the Restrictive Covenants." In justifying this finding, the district court, citing First Miami Secs., Inc. v. Bell, 758 So. 2d 1229, 1230 (Fla. Dist. Ct. App. 2000) (per curiam), noted that "[w]hen a former employee solicits clients in violation of a restrictive covenant, at least one Florida court has calculated the former employer's losses by looking to the revenues earned as a result of the solicitation."

Fla. Stat. § 542.335(1)(j) states that "[a] court shall enforce a restrictive covenant by any appropriate and effective remedy, including, but not limited to, temporary and permanent injunctions." Thus, Proudfoot may seek damages for any breaches of the enforceable restrictive covenants in the Agreement, but "[a]n award of damages for breach of contract is intended to place the injured party in the position he or she would have been in had the breach not occurred." Mnemonics, Inc. v. Max Davis Assocs., Inc., 808 So. 2d 1278, 1280 (Fla. Dist. Ct. App. 2002). As one court has explained:

To recover damages for lost profits in a breach of contract action, a party must prove a breach of contract, <u>that the party actually sustained a loss as a proximate result of that breach</u>, that the loss was or should have been within the reasonable contemplation of the parties, and that the loss alleged was not remote, contingent, or conjectural and the damages were reasonably certain.

<u>Frenz Enters., Inc. v. Port Everglades</u>, 746 So. 2d 498, 504 (Fla. Dist. Ct. App. 1999) (emphasis added); <u>see</u> <u>also</u> <u>W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.</u>, 545 So. 2d 1348, 1351 (Fla. 1989) (per curiam) (stating that in order to recover lost profits a plaintiff must prove that "the defendant's action caused the damage").  Thus, Proudfoot bears the burden to prove both that it sustained a loss and that "its lost profits were a direct result of" Gordon's breaches of the client non-compete covenant and non-solicitation clause.  <u>Whitby v. Infinity Radio Inc.</u>, 951 So. 2d 890, 898 (Fla. Dist. Ct. App. 2007) (applying these principles in the context of a covenant not to compete under Fla. Stat. § 542.335).

Although, under Florida law, "uncertainty as to the precise amount of the lost profits will not defeat recovery so long as there is a reasonable yardstick by which to estimate the damages," causation must be "proved with reasonable certainty."[23] <u>Nebula Glass Intern., Inc. v. Reichhold, Inc.</u>, 454 F.3d 1203, 1213, 1217 (11th Cir.

---

[23]  Even though plaintiffs have some leeway in estimating the amount of damages, calculating damages may still be difficult, which no doubt explains why many restrictive covenants have liquidated damages clauses.

40

2006) (citing W.W. Gay, 545 So. 2d at 1350-51); see also TruGreen Cos., L.L.C. v. Mower Bros., Inc., 199 P.3d 929, 932-33 (Utah 2008) (surveying cases involving covenants not to compete in the employment context and holding that although a defendant's profits may be relevant in measuring the amount of a plaintiff's lost profits, plaintiff must still prove the "fact of damages"). One of the reasons why injunctions are a favored remedy for breaches of restrictive covenants is that it is "inherently difficult" to determine "what damage actually is caused by the employee's breach of [of a restrictive covenant]." Capraro v. Lanier Bus. Prods., Inc., 466 So.2d 212, 213 (Fla. 1985) (citation omitted).

The district court erred, as a matter of law, in awarding Proudfoot damages for Gordon's solicitation of Bombardier because the district court never found that absent Gordon's breach, Proudfoot would have obtained the Bombardier Logistics project. Moreover, even if the district court had made such a finding, neither the underlying facts found by the district court nor any evidence in the record could support such a conclusion. The fact that Highland's "profits are inextricably linked to Gordon's breach of the Restrictive Covenants" is irrelevant absent a finding that Gordon's solicitation of Bombardier caused Proudfoot to lose business. Damages for breach of a non-compete are intended to make the prior employer whole, not to punish employees.

41

The cases relied on by Proudfoot and the district court do not hold that Proudfoot can recover damages without having to prove that it suffered a loss caused by Gordon's breach. Rather, these cases, which do not explicitly discuss the issue of causation, simply suggest that if Proudfoot could show that it lost the Bombardier Logistics project due to Gordon's breach, the amount of Proudfoot's lost profits could be calculated by looking at Highland's profits.

In First Miami, 758 So. 2d 1229, the defendant employee had used confidential information to solicit customers from his former employer, resulting in some of the accounts being transferred to his new employer. The trial court had concluded, based on various records regarding the transferred accounts, that "damages can be readily calculated from the commissions derived by Defendant at his new place of employment." Id. at 1230. While First Miami never explicitly discusses causation, the decision clearly implies that but for the defendant's solicitation, the transferred accounts would have stayed at the former employer. Under such circumstances, it may be reasonable to assume that, absent the defendant's solicitation, those accounts would have generated the same amount of commissions if they had remained with the former employer.

Similarly, in Litwinczuk v. Palm Beach Cardiovascular Clinic, L.C., 939 So. 2d 268, 272 (Fla. Dist. Ct. App. 2006), where a doctor began seeing patients from his

42

former employer, causation was not at issue. In <u>Litwinczuk</u>, the court merely implied that the former employer's losses may have been "calculable" based on what the doctor was currently billing those patients. Moreover, the cases from other jurisdictions cited to in the district court's decision all involve similar scenarios where there was no dispute that the loss suffered was caused by the breach.

Here, however, there is simply insufficient direct or circumstantial evidence in the record from which it could reasonably be inferred that Proudfoot lost the Bombardier Logistics Project to Highland. Contrary to Proudfoot's claim, the fact that Proudfoot would have been able to perform the work on the Bombardier Logistics project does not, standing alone, show that Proudfoot would have obtained the project absent the involvement of Highland (or, more specifically, of Gordon).

Proudfoot chose not to call any witnesses from Bombardier to testify about the Bombardier Logistics project. While Proudfoot may have had sound business reasons to avoid embroiling a client in this litigation, without such testimony the record is devoid of any evidence that Proudfoot lost the Bombardier Logistics project to Highland. <u>See</u> <u>Nebula Glass</u>, 454 F.3d at 1215 (finding evidence sufficient to show that defective component provided by defendant caused

43

plaintiff to lose customers where, <u>inter</u> <u>alia</u>, two customers testified that they stopped purchasing plaintiff's product because of the defective component). Moreover, Proudfoot did not provide any records indicating that it had made a proposal in connection with the Bombardier Logistics project and offered no evidence that it had any, even embryonic, plans for proposing a similar project to Bombardier. Nor was there any testimony that Proudfoot would have eventually pitched this project to Bombardier.

Furthermore, the district court found few facts concerning the origin of the Bombardier Logistics project. The district court simply found that in February 2007, Gordon was personally involved in the "design and discovery" phase of this project. Without knowing how Highland secured this project, it is impossible to infer that Proudfoot ever even had a chance at obtaining the project. Similarly, there is little evidence about the origin of Proudfoot Europe's own Bombardier project and no evidence about Bombardier's process for awarding consulting projects. It should be noted that Gordon testified that Highland obtained the Bombardier Logistics project because of an internal Bombardier referral based on the successful delivery of the Bombardier Interiors project.[24] The district court

---

[24] The district court based the damages award solely on Gordon's solicitation of the Bombardier Logistics project, never mentioning the Bombardier Interiors project in its discussion of damages. As noted earlier, Highland began working on the Bombardier Interiors project

44

never found that this testimony was not credible and there was no competing evidence offered by Proudfoot to explain the origins of the Bombardier Logistics project.

In addition, given the scant details about both the Bombardier project performed by Proudfoot Europe and Highland's Bombardier projects, it is impossible to infer that Proudfoot Europe's work for Bombardier would have necessarily led to Proudfoot securing the Bombardier Logistics project. The record also shows that Highland's Bombardier projects were performed in Canada, whereas Proudfoot Europe's project occurred in the United Kingdom. Notably, there is no evidence that Proudfoot ever even sought to perform any projects for Bombardier in Canada.

Finally, we note that the use of the term "ill-gotten profits," which is found in both the district court's decision and throughout Proudfoot's brief, reveals what Proudfoot is truly seeking – not damages it suffered – but simply disgorgement of Highland's profits. Yet, Proudfoot conspicuously avoids explicitly raising this argument and cites to no authority showing that Florida law permits disgorgement of profits for breach of contract.[25] While Proudfoot points to the equitable

_____

before Gordon joined Highland.

[25] If the violation of a restrictive covenant also involves misappropriation of trade secrets, a court is empowered to grant relief beyond ordinary contract damages. See Fla. Stat. § 688.004.

45

principle that "'no one shall be permitted to profit by his own fraud, or take advantage of his own wrong, or found any claim upon his own iniquity, or profit by his own crime,'" Cabrerizo v. Fortune Intern. Realty, 760 So. 2d 228, 229 (Fla. Dist. Ct. App. 2000) (quoting Ashwood v. Patterson, 49 So. 2d 848, 850 (Fla. 1951)), Proudfoot cites to no authority applying this principle to award disgorgement of profits as damages in a breach of contract case. As this Court has recognized, under Florida law, disgorgement of profits earned is not a remedy for breach of contract.[26] Burger King Corp. v. Mason, 710 F.2d 1480, 1494 (11th Cir. 1983). Moreover, even if disgorgement were an appropriate remedy, Proudfoot seeks the "ill-gotten profits" of Highland, who is not even a party to this litigation.

Proudfoot alternatively argues that we should remand this case back to the district court for a damages finding pursuant to an alternative methodology. In Proudfoot's Proposed Findings, Proudfoot presented two alternative damages proposals. First, Proudfoot argued that it is entitled to the total profits that

---

(allowing court to award unjust enrichment beyond actual loss caused by misappropriation or "a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret."). The instant case does not involve trade secrets.

[26] In the specific context of contracts to purchase real property, the Florida Supreme Court has held that "[a] seller will not be permitted to profit from his breach of a contract with a buyer, even absent proof of fraud or bad faith, when the breach is followed by a sale of the land to a subsequent purchaser." Coppola Enters., Inc. v. Alfone, 531 So. 2d 334, 335-36 (Fla. 1988). We have found no Florida authority suggesting that this principle permits disgorgement of profits in an ordinary breach of contract action.

Highland earned on all projects that Gordon worked on for Highland through the date of trial. This theory is untenable for many of the same reasons that we reverse the district court's damages award. Second, Proudfoot argues that, "as a matter of equity," Gordon should be "required to disgorge" to Proudfoot the total compensation that he received while employed at Highland. The authority relied on by Proudfoot does not persuade us that Florida law would permit such relief in this context. For example, Proudfoot cites to <u>Phillips Chem. Co. v. Morgan</u>, 440 So. 2d 1292 (Fla. Dist. Ct. App. 1983), which required disgorgement where the employee received kick-backs in breach of his fiduciary duty to his employer. That circumstance is clearly dissimilar. As such, we find no reason to remand the damages issue back to the district court.[27]

---

[27] As Proudfoot has never clearly raised a claim of unjust enrichment or restitution, it is unnecessary to determine whether such claims would be actionable in this context. Even if Proudfoot had pursued such relief, one element of an unjust enrichment claim is that "it would be inequitable for the defendant to retain the benefit without paying <u>fair value</u> for it." <u>Banks v. Lardin</u>, 938 So.2d 571, 577 (Fla. Dist. Ct. App. 2006) (emphasis added), <u>review denied</u>, 959 So.2d 718 (Fla. 2007). We fail to see how the amount of total compensation earned by Gordon at Highland would be indicative of the value of any benefits that Proudfoot may have conferred upon him. Although Gordon received a raise when he joined Highland, it is difficult to understand how Proudfoot could even attempt to quantify the portion of that increase that is attributable to Gordon's knowledge of Proudfoot's confidential information. In any event, that question is purely academic as Proudfoot has made no such attempt.

## IV. CONCLUSION

Although Gordon has failed to establish that the injunction was inappropriate, we reverse the damages award. Proudfoot did not establish that it would have obtained the Bombardier Logistics project were it not for Gordon's breach; accordingly, Proudfoot has failed to establish that it suffered any financial loss.

**REVERSED.**