[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-13412

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 27, 2011
JOHN LEY
CLERK

D.C. Docket No. 6:06-cv-00089-BAE-GRS

NICOLAS RAMOS-BARRIENTOS,
on behalf of themselves and all other similarly situated persons,
ANSELMO HERNANDEZ-MARTINEZ,
on behalf of themselves and all other similarly situated persons,
JORGE HERNANDEZ-ANTONIO,
on behalf of themselves and all other similarly situated persons,
GREGORIO PONCE-HERNANDEZ,
on behalf of themselves and all other similarly situated persons,
CATALINO HERNANDEZ-RUBIO,
on behalf of themselves and all other similarly situated persons,

Plaintiffs - Appellants,

OMAR SANCHEZ-COVARRUBIAS,
ELIAS LOPEZ-HERNANDEZ,
AMANCIO PEREZ-ANGELES,
AMANCIO PEREZ-MARTINEZ,
JOSE C. NAJERA-QUIROZ,
ESTEBAN HERNANDEZ-MARTINEZ,
JOSE PARDO-NAJERA,

Interested Parties - Appellants,

versus

DELBERT C. BLAND,

BLAND FARMS, LLC,
MANPOWER OF THE AMERICAS,
CONSULAR SERVICES INTERNATIONAL,
MICHAEL BRYAN BELL,

                                        Defendants - Appellees,

Bland Farms I, LLC, et al.,

                                        Defendants.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(October 27, 2011)

Before EDMONDSON and PRYOR, Circuit Judges, and BOWDRE,[*] District Judge.

PRYOR, Circuit Judge:

The main issue is this appeal is whether an employer that hires migrant farm workers through the H-2A visa program is entitled to wage credits under the Fair Labor Standards Act, see 29 U.S.C. § 203(m), for housing and meals that federal law required the employer to provide the workers. Migrant farm workers who worked for Bland Farms, LLC, appeal a summary judgment in favor of Bland and

_____

[*]Honorable Karon O. Bowdre, United States District Judge for the Northern District of Alabama, sitting by designation.

against their complaint that Bland violated the Act. The workers allege that Bland paid them below the minimum wage in violation of the Act, id. § 206, when it failed to reimburse them for fees and travel costs they incurred during their travel from Mexico to Bland's farms in Georgia. The district court held that Bland was entitled to wage credits, id. § 203(m), for the cost of housing and meals that Bland provided the workers and that those credits offset any amounts owed the workers for expenses they incurred during their travel. The Secretary of Labor, as amicus curiae, argues that Bland is not entitled to wage credits for the provision of free housing for the workers, which is required by federal law, 20 C.F.R. § 655.122(d)(1), because this cost primarily benefits the employer. See 29 C.F.R. § 531.3(d)(1). We defer to the Secretary's interpretation, Auer v. Robbins, 519 U.S. 452, 117 S. Ct. 905 (1997), that Bland cannot credit the cost of housing in the wages paid to the workers and we agree with Bland that it is entitled to wage credits for the cost of meals for the workers. We also conclude that Bland is not liable under principles of agency law for the fees that third parties charged the workers related to their efforts to obtain employment with Bland. We affirm in part, reverse in part, and remand.

# I. BACKGROUND

Bland Farms, LLC, formerly a sole proprietorship owned by Delbert C. Bland, grows Vidalia onions, the famous and delicious variety of sweet onion grown exclusively in southeastern Georgia, see 7 C.F.R. § 955.4. For years, Bland has hired hundreds of migrant farm workers from Mexico through the H-2A visa program to work at its farms near Glennville, Georgia, during the fall planting and spring harvesting seasons. Bland and other employers that participate in the H-2A program hire workers in foreign countries and must comply with federal regulations that govern both labor and immigration policy. In the summer of 2001, representatives of Bland began discussions with International Labor Management Corporation about the possible delegation to International Labor of some of these administrative responsibilities.

On August 3, 2001, Lee Wicker, a representative of International Labor who falsely presented himself as the vice president of the company, traveled to Georgia to meet with Clarke Yearous, the chief operations officer for Bland; Sloan Lott, the operations manager for Bland; and two other individuals who also worked for Bland. Wicker explained at the meeting that International Labor could handle all of the government paperwork and filings pertaining to the H-2A program. International Labor also "had people in place in Mexico," who could assist the

migrant farm workers with "issues [they] had at the consulate in Mexico." Wicker assured Bland's representatives that Bland could hire the same workers that it had employed in past growing seasons.

Yearous and Lott disagree with Wicker about a key detail of the meeting: whether the workers would be charged any undisclosed fees. Yearous testified that he "asked Lee Wicker, specifically, several times if there would be any 'under-the-table' charges to the workers[,] and every time [Wicker] assured [Yearous] there would be no extra charge." Yearous also testified that Wicker assured him that "there would be no hidden fees that Bland Farms would have to pick up and there would be no unethical or unforseen charges to [Bland's] workers." Lott had a similar recollection, as he testified that "Yearous asked Mr. Wicker numerous times[] during that meeting whether there would be any charges to the workers for services provided to Bland Farms[,] and Mr. Wicker told Mr. Yearous there would be no charges to the workers." But Wicker testified that he had no recollection of any discussion during any of the negotiations that occurred in 2001 of "any additional fees that Bland would have to pay over and above the[] flat fees" to International Labor. He disagreed with the contentions of Lott and Yearous that he had "promised no fees would be charged [to the] workers" and further testified that he "was never in a position to promise clients that there would

5

be no such fee." Wicker could not make such a promise because the "people in place in Mexico" who Wicker referenced at the meeting did not work for International Labor. They instead worked for affiliates of International Labor—initially Manpower of the Americas and later Consular Services International. Wicker testified that he explained to Bland in 2001 that Manpower, not International Labor, would provide assistance to the workers in Mexico, and that he ordinarily explained to potential clients that Manpower and Consular Services charged fees to the workers. Wicker never testified that he told representatives of Bland about these fees.

Later communications clarified the services that International Labor would perform for Bland, but did not address whether anyone would charge the workers any fees. In a letter dated August 23, 2001, Wicker gave Bland "several options to consider." For $10,000 per year, International Labor would provide "consulting as well as administrative services" in a package that "would include all aspects of crafting/modifying [Bland's] work agreements, all interaction with the various branches of government including the visa application process with INS," and payment of "all fees associated with the application process on behalf of Bland Farms." The letter reassured Bland that it could "get [its] former H-2A workers (preferred workers) back without any problem." The letter also explained that

6

"Manpower of the Americas . . . would handle all the necessary recruitment services and provide timely replacement workers."  The letter did not discuss any other responsibilities that Manpower might handle.

Further negotiations proved successful, and Bland entered an agency and indemnity agreement with International Labor for the 2002 harvesting and planting seasons.  Bland entered similar agreements with International Labor each year from 2003 through 2007.  The agreements provided that International Labor would "prepare and process forms and documents" required for participation in the H-2A program, maintain all necessary contacts with state and federal agencies on behalf of Bland, and "undertake the administrative tasks of the domestic recruitment requirements" imposed by federal regulations.

The agreements that Bland signed borrowed most of their language from the standard agreement that International Labor entered with clients, with one key exception: the agreements did not address the recruitment of workers from Mexico.  The standard agreement provided that International Labor would "undertake recruitment . . . for the purpose of recruiting the number of supplementary farm laborers from domestic sources and/or temporary agricultural employees from the Republic of Mexico under the H-2A program."  The standard agreement also provided that International Labor would "prepare and process

7

forms and documents" required "to obtain U.S. workers and/or H-2A workers from the Republic of Mexico." But the agreements that Bland signed did not mention the recruitment of workers from Mexico and related administrative responsibilities. Bland instead recruited most of its workers on its own. Bland explained that its recruiters would "travel to Mexico and attempt to locate people who [were] interested in coming to work for [it]." Bland concedes that it hired International Labor to recruit workers "[i]n rare cases," but none of the workers contend that International Labor or one of its affiliates in Mexico recruited them to work for Bland. International Labor also charged Bland $7,500 each year for its services, not its standard rate of $10,000.

Bland had to obtain certification from the Department of Labor before it could hire workers through the H-2A program. 8 U.S.C. § 1188(a); 20 C.F.R. § 655.103(a). Employers may hire workers from foreign countries through the H-2A program only under certain conditions. See 8 U.S.C. § 1188; 20 C.F.R. pt. 655, subpt. B. Before an employer may obtain certification to hire workers through the H-2A program, the Secretary of Labor must be satisfied that "there are not sufficient workers who are able, willing, and qualified" to work for the employer, 8 U.S.C. § 1188(a)(1)(A), and that "the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in

8

the United States similarly employed," id. § 1188(a)(1)(B).  To accomplish these goals, the Secretary must deny certification if "the employer has not made positive recruitment efforts within a multi-state region of traditional or expected labor supply" and a significant number of qualified and willing American workers are in that region.  Id. § 1188(b)(4).  Employers may also have to pay workers at a rate higher than the federal minimum wage.  See Arriaga v. Fla. Pac. Farms, L.L.C., 305 F.3d 1228, 1233 (11th Cir. 2002).

Employers must also agree to provide certain benefits to workers hired through the H-2A program.  Federal law that "appl[ies] in the case of the filing and consideration of an application for a labor certification," 8 U.S.C. § 1188(c), requires employers to "furnish housing in accordance with regulations," id. § 1188(c)(4).  The corresponding regulation requires employers to provide in their employment contracts with workers a provision under which "[t]he employer must provide housing at no cost to the H-2A workers . . . who are not reasonably able to return to their residence within the same day."  20 C.F.R. § 655.122(d)(1).  Bland provided the workers with housing, and the district court accepted the cost of the housing as $50 per week per worker.

Other regulations require employers to promise additional benefits in their work contracts.  See id. § 655.122.  Among these benefits, employers must

9

promise to provide H-2A workers who complete 50 percent of the work contract period payment "for reasonable costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer." Id. § 655.122(h)(1). Consistent with the contractual obligations required by federal regulations, Bland provided the workers between $21.95 and $22.70 as reimbursement for the costs of meals they consumed during their travel. Bland also reimbursed them for the cost of their travel from their homes to the consular post in Monterrey, Mexico, and from the American border to the farm in Georgia. Bland also reimbursed the workers for the $200 visa fee that the United States Consulate had charged them.

Bland did not reimburse the workers for all of the expenses they incurred during their travel to the farm. Bland did not reimburse a $6 border crossing fee and the cost of travel from the United States consular post in Monterrey, Mexico, to the American border. Some workers also had to obtain Mexican passports to participate in the H-2A program, and Bland did not reimburse any of the workers for this expense. The district court accepted Bland's calculation of these unreimbursed expenses to total less than $50 per year per worker, and the workers do not challenge this finding.

Bland also did not reimburse the workers for a fee equal to approximately $200 that Manpower or Consular Services charged each worker for assistance provided at the consulate. Bland believed that International Labor would provide this assistance to the workers, and that Manpower and its successor, Consular Services, provided only recruitment services. Although Bland primarily conducted its own recruitment, Bland communicated with Manpower and Consular Services and was aware that these companies provided some services for Bland. International Labor knew that Manpower and Consular Services charged fees to the workers, and it did not instruct them not to collect these fees.

Bland argues that it was unaware of the fees that Manpower and Consular Services charged. An employee of Bland testified that, amid the extensive communications between Bland and International Labor, "not a single email from [International Labor], its agents, and/or personnel ever informed Bland that [International Labor] and/or its agents or personnel were charging fees to Bland H[-]2A workers." Wicker continued to communicate with Bland after Bland entered its initial agreement with International Labor, but Wicker testified that he had no recollection of whether he had informed Bland about this fee. Bland gave the workers a form upon their arrival to list reimbursable expenses, but none of the workers disclosed the fee charged by Manpower or Consular Services.

11

Five workers who worked for Bland between 2001 and 2006 filed a complaint in the Southern District of Georgia on September 25, 2006, against Bland, International Labor, Manpower, and Consular Services; an amended complaint added Michael Bell, president of both Manpower and Consular Services, as a defendant. The amended complaint included a claim that the defendants had violated the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. The workers argued that Bland shifted business expenses to the workers and effectively lowered their pay below the minimum wage when it failed to reimburse the workers for expenses incurred during their travel, specifically the cost of transportation from Monterrey to the American border, the border crossing fee, passport fees, and the fees that Manpower and Consular Services had charged. The workers also alleged a breach of contract by Bland based on the failure to pay promised wages and transportation expenses, and violations of statutory and contractual obligations under the Georgia right to work law, Ga. Code Ann. § 34-6-21. The amended complaint requested damages, declaratory and injunctive relief, and costs and attorney's fees. The workers moved for class certification, and the district court conditionally certified a collective action under the Act, 29 U.S.C. § 216(b), but denied certification under Federal Rule of Civil Procedure 23.

The district court granted summary judgment in favor of Bland and against the claim of the workers that they were entitled to reimbursement for expenses incurred during their travel. The district court held that Bland could credit the cost of housing and the reimbursements for meals as part of the wages of the workers and the credit of these amounts in the wages of the workers offset any amount owed them for expenses related to their travel to Georgia. The district court relied on a provision of the Fair Labor Standards Act that allows wage credits for "the reasonable cost" of "board, lodging, or other facilities" if the "facilities are customarily furnished by such employer to his employees." 29 U.S.C. § 203(m). The district court reasoned that Bland was "entitled to a § 203(m) wage credit for the reasonable cost of housing" provided to the workers "[b]ecause housing is 'customarily furnished' and indeed required by H-2A regulations." The district court concluded that Bland "do[es] not violate those regulations by taking a § 203(m) wage credit for the reasonable cost of housing," and meals. Because it reasoned that Bland had complied with the Act, the district court also entered summary judgment in favor of Bland against the claim of the workers that Bland had violated a contractual agreement to pay wages in accordance with the law.

In a separate order, the district court granted Bland's motion for summary judgment against the workers' claim that Bland had to reimburse them for the fee

13

that Manpower and Consular Services had charged. The district court found that "there is no evidence that [Bland] authorized [International Labor], [Manpower], or [Consular Services] to collect processing and recruiting fees" or that Bland, "by word or conduct, said or did anything to cause any H-2A worker to believe that [International Labor], [Manpower], or [Consular Services] were authorized to collect such fees." The district court also granted summary judgment in favor of Bland on the workers' right to work claims.

## II.  STANDARD OF REVIEW

We review a summary judgment de novo.  Beach Cmty. Bank v. St. Paul Mercury Ins. Co., 635 F.3d 1190, 1194 (11th Cir. 2011).  "We apply the same legal standards that bound the district court and view all facts and reasonable inferences in the light most favorable to the nonmoving party."  Shuford v. Fid. Nat'l Prop. & Cas. Ins. Co., 508 F.3d 1337, 1341 (11th Cir. 2007).

## III.  DISCUSSION

We divide our discussion in two parts.  First, we address whether Bland is entitled to wage credits, 29 U.S.C. § 203(m), for expenditures for housing and reimbursements for meals.  Second, we address whether Bland must reimburse the workers for the fees that Manpower and Consular Services charged them.

*A.  Bland Is Not Entitled to a Wage Credit for Housing,*

14

*but Is Entitled to a Wage Credit for Meals.*

The Fair Labor Standards Act requires employers to pay their employees a minimum wage. 29 U.S.C. § 206. "'[W]ages' cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or 'free and clear.'" 29 C.F.R. § 531.35. This rule prohibits any arrangement that "tend[s] to shift part of the employer's business expense to the employees . . . to the extent that it reduce[s] an employee's wage below the statutory minimum." Mayhue's Super Liquor Stores, Inc. v. Hodgson, 464 F.2d 1196, 1199 (5th Cir. 1972); see also Shultz v. Hinojosa, 432 F.2d 259, 267 (5th Cir. 1970).

"The only statutory exception to the requirement that wages be paid free and clear appears in 29 U.S.C.[] § 203(m)[] . . . ." Brennan v. Veterans Cleaning Serv., Inc., 482 F.2d 1362, 1369 (5th Cir. 1973); see also Arriaga v. Fla. Pac. Farms, L.L.C., 305 F.3d 1228, 1235 (11th Cir. 2002). Section 203(m) provides that a "'[w]age' paid to any employee includes the reasonable cost, as determined by the Administrator, to the employer of furnishing such employee with board, lodging, or other facilities, if such board, lodging, or other facilities are customarily furnished by such employer to his employees." 29 U.S.C. § 203(m). "Accordingly, the employer lawfully may deduct from an employee's pay the

15

reasonable cost of employer provided housing," Caro-Galvan v. Curtis Richardson, Inc., 993 F.2d 1500, 1513 (11th Cir. 1993), and meals, Donovan v. New Floridian Hotel, Inc., 676 F.2d 468, 473 (11th Cir. 1982), "even if that deduction results in the employee's cash pay falling below the statutory minimum," Caro-Galvan, 993 F.2d at 1513. "Once the employee proves that the wages received were less than the statutory minimum, the burden shifts to the employer to prove with proper records the reasonable cost of the housing," id. at 1514, and meals that it provided, Donovan, 676 F.2d at 475.

Bland argues that it is entitled to wage credits for housing and meals under section 203(m) to offset any amounts owed the workers for travel expenses: that is, the fees for passports; the cost for transportation from Monterrey, Mexico, to the American border; and the fee paid to cross the border. The workers and the Secretary argue that the cost of housing that Bland provided, as required by federal law, may not be included in wages. The workers also dispute that the cost of meals may be treated as part of wages.

Our discussion of these issues is divided in two parts. We first address whether Bland may receive wage credits under section 203(m) for the cost of housing that it provided to the workers. We then address whether Bland may

16

receive wage credits under section 203(m) for reimbursements for the meal expenses the workers incurred during their travel to Bland's farm.

1. Bland May Not Receive Wage Credits for the Cost of Housing.

The workers and the Secretary argue that the district court erred when it allowed Bland to receive wage credits for the cost of housing that it provided to the workers. They contend that section 203(m) establishes a rebuttable presumption that an employer may receive a wage credit for the cost of housing and that this presumption is rebutted when the provision of housing is "primarily for the benefit or convenience of the employer," 29 C.F.R. § 531.3(d)(1). They argue that the provision of housing primarily benefitted Bland because federal law required Bland to provide this housing free of charge, see 8 U.S.C. § 1188(c)(4); 20 C.F.R. § 655.122(d)(1), and "expenses imposed on the employer by law also must be viewed as inherently for the primary benefit of the employer" "[b]ecause an employer is not permitted to operate its business in violation of the law." Bland argues that section 203(m) may not be read to provide an exception for free housing required by federal law.

A key regulation prevents employers from exploiting section 203(m) to shift business expenses to employees: "The cost of furnishing 'facilities' found by the Administrator to be primarily for the benefit or convenience of the employer will

17

not be recognized as reasonable and may not therefore be included in computing wages." 29 C.F.R. § 531.3(d)(1). As used in section 203(m), "facilities" is a broad term that includes expenses as diverse as tools of the trade, id. § 531.3(d)(2), uniforms, id., and travel costs, Arriaga, 305 F.3d at 1242. Employers must reimburse employees for their expenditures on facilities that primarily benefit the employer to the extent that these expenditures reduce employee pay below the minimum wage. See, e.g., id. at 1237 n.11. In Arriaga, we held that, under section 531.3(d), employers that hire workers through the H-2A program must reimburse the workers for the cost of visas, id. at 1244, and the cost of the workers' transportation from their home countries to the work site up to the point that the minimum wage requirements of the Act are met, id. at 1242.

Bland contends that our decision in Arriaga is inconsistent with our earlier precedent in Davis Bros. v. Donovan, 700 F.2d 1368 (11th Cir. 1983), but we disagree. Davis Bros. held "merely that[] . . . Congress has allowed employers to take a credit on the cash component of their minimum wage obligation for meals regularly provided even if the employees are not given the continuing option to take cash instead." Id. at 1372. Arriaga had nothing to do with the issue decided in Davis Bros.: the availability of a wage credit when employees did not voluntarily choose to accept in kind payments in lieu of cash payments. Bland

18

argues alternatively that Arriaga is wrong even if it does not conflict with Davis Bros., but "we are bound by our prior precedent," Thomas v. Carnival Corp., 573 F.3d 1113, 1117 (11th Cir. 2009).

Under the deferential standard of Auer v. Robbins, 519 U.S. 452, 117 S. Ct. 905 (1997), we accept the interpretation of the Secretary that an employer may not receive wage credits under section 203(m) for the housing provided H-2A workers because this expense primarily benefits the employer under section 531.3(d)(1). "Because the ['primarily benefits'] test is a creature of the Secretary's own regulations, [her] interpretation of it is[] . . . controlling unless 'plainly erroneous or inconsistent with the regulation.'" Auer, 519 U.S. at 461, 117 S. Ct. at 911 (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 359, 109 S. Ct. 1835, 1850 (1989)); see also Talk Am., Inc. v. Mich. Bell Tel. Co., 564 U.S. --, --, 131 S. Ct. 2254, 2260–61 (2011); Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413–14, 65 S. Ct. 1215, 1217 (1945). It is irrelevant "that the Secretary's interpretation comes to us in the form of a legal brief; . . . that does not, in the circumstances of this case, make it unworthy of deference. The Secretary's position is in no sense a 'post hoc rationalizatio[n]' advanced by an agency seeking to defend past agency action against attack." Auer, 519 U.S. at 462, 117 S. Ct. at 912 (second alteration in original) (quoting Bowen v.

19

Georgetown Univ. Hosp., 488 U.S. 204, 212, 109 S. Ct. 468, 474 (1988)); see also Talk Am., 564 U.S. at --, 131 S. Ct. at 2260–61. "Nor is there any other 'reason to suspect that the interpretation does not reflect the [Secretary's] fair and considered judgment on the matter in question.'" Talk Am., 564 U.S. at --, 131 S. Ct. at 2263 (quoting Auer, 519 U.S. at 462, 117 S. Ct. at 912). The Secretary argues that section 203(m) establishes only a presumption that the cost of housing may be included in wages and that this presumption may be rebutted when the provision of the housing is "primarily for the benefit or convenience of the employer," 29 C.F.R. § 531.3(d)(1). We accept this argument because section 531.3(d)(1) is a valid regulation, see Shultz, 432 F.2d at 267, and section 203(m) textually applies to housing.

Bland contends that Auer is inapplicable because the Secretary has no authority under the Act to require Bland to pay the expenses of the workers, but we disagree. Bland ignores statutory language that gives the Secretary "authori[ty] to supervise the payment of the unpaid minimum wages . . . owing to any employee or employees under section 206," 29 U.S.C. § 216(c), and Bland ignores precedent that holds that section 531.3(d)(1) is a valid regulation, Shultz, 432 F.2d at 267.

20

Bland argues that the "primarily benefits" test of section 531.3(d)(1) is inapplicable to housing because the only restrictions that section 203(m) imposes on the availability of wage credits for the cost of housing are the requirements that the housing be "customarily furnished" and that the cost be "reasonable," but this argument also fails. Section 203(m) treats housing as a type of facility, see 29 U.S.C. § 203(m) (referring to "lodging[] or other facilities"), and section 531.3(d)(1) provides a criterion for determination of whether a facility is "reasonable" under section 203(m). We have applied section 531.3(d)(1) to deny wage credits for "other facilities" even though section 203(m) places no more restrictions on the availability of credits for "other facilities" than for lodging. See Shultz, 432 F.2d at 267; see also Soler v. G. & U., Inc., 833 F.2d 1104, 1110 (2d Cir. 1987) (an employer may be denied a wage credit for the cost of housing "[w]here the statutory presumption is rebutted by substantial evidence demonstrating that the housing is not a benefit running primarily to the employee, but rather a burden imposed upon the employee in furtherance of the employer's business.") Several other courts also have denied wage credits under section 203(m) for housing found to benefit primarily the employer, such as housing for employees who were required to be on duty at all hours. See, e.g., Jiao v. Shi Ya Chen, No. 03 Civ. 0165(DF), slip op. at 14 (S.D.N.Y. Mar. 30, 2007); Marshall v.

21

DeBord, No. 77-106-C, slip op. at 6–8 (E.D. Okla. July 27, 1978); Bailey v. Pilots' Ass'n for Bay & River Del., 406 F. Supp. 1302, 1309 (E.D. Pa. 1976). We apply the "primarily benefits" test of section 531.3(d)(1) to the provision of housing by Bland to workers hired through the H-2A program.

We accept as not "'plainly erroneous or inconsistent with the regulation,'" Auer, 519 U.S. at 461, 117 S. Ct. at 911 (quoting Robertson, 490 U.S. at 359, 109 S. Ct. at 1850), the Secretary's argument that Bland may not receive wage credits for housing required by law because these expenditures are "primarily for the benefit or convenience of [Bland]," 29 C.F.R. § 531.3(d)(1). The Secretary's position is consistent with statutory and regulatory texts and our earlier interpretations of those provisions. The cost of housing that Bland provided to the workers hired through the H-2A program was a mandatory business expense, and Bland cannot "shift part of [its] business expense to the employees," Mayhue's Super Liquor Stores, 464 F.2d at 1199. Arriaga examined the distinction between facilities that primarily benefit or convenience the employer and facilities that may be included in wages and concluded that "it is apparent that the line is drawn based on whether the employment-related cost is a personal expense that would arise as a normal living expense." 305 F.3d at 1243. See also Shultz, 432 F.2d at 267 ("[T]he words 'other facilities' are to be considered as being in pari materia

22

with the preceding words 'board and lodging.'"). The cost of housing for the workers near a job site far from their permanent residence did not arise "in the course of ordinary life," Arriaga, 305 F.3d at 1242, but instead was required by federal law as a condition of Bland's participation in the H-2A program and arose "from the employment itself," id.

The Secretary's position is also consistent with regulations that provide examples of facilities that primarily benefit the employer because they are necessary business expenses. These facilities include "[t]ools of the trade," "the cost of any construction by and for the employer," and "the cost of uniforms and of their laundering." 29 C.F.R. § 531.3(d)(2). The Department of Labor has also long maintained that employers primarily benefit from expenditures for "company police and guard protection; taxes and insurance on the employer's buildings which are not used for lodgings furnished to the employee," id. § 531.32(c), and the payment of any tax that the law requires the employer to pay, id. § 531.38. By contrast, taxes that the employer is not required by law to pay, including "the employee's share of social security and State unemployment insurance taxes," may be included in wages. Id.

The Secretary has long maintained that the provision of some services required by law may primarily benefit the employer even if they provide some

23

benefit to employees.  An employer may not receive a wage credit for "medical services and hospitalization which [it] is bound to furnish under workmen's compensation acts," id. § 531.32(c), for example, even though employees would be the beneficiaries of any services provided under those acts.  The cost of safety caps provided to miners also may not count toward the wages of miners under section 203(m), 29 C.F.R. § 531.32(c), even though these caps help protect miners from injuries.

Bland argues that the interpretations contained in sections 531.32 and 531.38 are not entitled to deference under Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 104 S. Ct. 2778 (1984), and that we should not rely on them, but this argument fails.  Even if these interpretations in sections 531.32 and 531.38 are not entitled to deference under Chevron or Auer, they are persuasive under Skidmore v. Swift & Co., 323 U.S. 134, 65 S. Ct. 161 (1944), in part because they were adopted in 1967, see 32 Fed. Reg. 13575, 13577–79 (1967), and "[w]e 'normally accord particular deference to an agency interpretation of "longstanding" duration,'" Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 487, 124 S. Ct. 983, 1001 (2004) (quoting Barnhart v. Walton, 535 U.S. 212, 220, 122 S. Ct. 1265, 1270 (2002) (quoting N. Haven Bd. of Educ. v. Bell, 456 U.S. 512, 522 n.12, 102 S. Ct. 1912, 1918 n.12 (1982))).

Although section 203(m) ordinarily applies to farm workers, employers of farm workers do not enjoy a wholesale exemption from statutory provisions and regulations that limit the applicability of wage credits under section 203(m). Courts have allowed wage credits for housing that agricultural employers have provided to their employees, but these decisions did not involve the provision of free housing required by law. See, e.g., Soler, 833 F.2d at 1110; Martinez v. Deaf Smith Cnty. Grain Processors, Inc., 583 F. Supp. 1200, 1206–08 (N.D. Tex. 1984). Other decisions that Bland cites that allowed wage credits under section 203(m) for work site housing also did not involve free housing that a law required the employer to provide. See Marshall v. Truman Arnold Distributing Co., 640 F.2d 906, 909 (8th Cir. 1981); Walling v. Alaska Pac. Consol. Mining Co., 152 F.2d 812, 815 (9th Cir. 1946).

Bland argues that it provided housing to the workers under contractual provisions, not federal law, but we disagree. Even if a regulation required Bland only to promise in its work contracts to provide housing, 20 C.F.R. § 655.122(d)(1), (q), a statute provided that Bland "shall furnish housing," 8 U.S.C. § 1188(c)(4). We reverse the summary judgment that Bland may receive wage credits for the housing it provided to the workers.

2. Bland May Receive Wage Credits for Reimbursements for Meals.

25

The workers also argue, without the Secretary's support, that the district court erred when it held that Bland could receive wage credits for reimbursements provided for meals, but this argument fails. Federal regulations required Bland to promise to reimburse the workers for the meal expenses incurred during their travel to Bland's farm, but the workers wisely do not rely on the "primarily benefits" test of section 531.3(d)(1). Under section 203(m), "meals are always regarded as primarily for the benefit and convenience of the employee." 29 C.F.R. § 531.32(c). Unlike the cost of work site housing, the workers would have incurred expenses for food "in the course of ordinary life." Arriaga, 305 F.3d at 1242.

The workers present two arguments to support their position that Bland may not receive wage credits for meal reimbursements, but both of these arguments fail. First, the workers argue that Bland may not receive wage credits for meals because the H-2A regulations require that Bland cover these expenses and, to the extent these regulations overlap with section 203(m), Bland must follow the provision that gives the greater benefit to the workers. This argument fails because the workers have alleged a violation of the Fair Labor Standards Act, not a violation of the regulations that govern the H-2A visa program or a violation of any contractual obligation to abide by the H-2A regulations. The contractual

26

claim that the workers alleged in their complaint involved the failure to pay wages, not the failure to provide reimbursements for the cost of meals. Second, the workers argue that Bland may not receive wage credits for the meals because "[f]acilities furnished in violation of any Federal, State, or local law, ordinance or prohibition will not be considered facilities 'customarily' furnished," 29 C.F.R. § 531.31, but this argument is flawed. The workers rely on the regulations that require employers of H-2A workers to promise in their work contracts to reimburse workers for inbound subsistence. See 20 C.F.R. § 655.122(q). Because "there is no legal difference between deducting a cost directly from the worker's wages and shifting a cost, which [an employer] could not deduct, for the employee to bear," Arriaga, 305 F.2d at 1236, the workers insist that Bland would violate the H-2A regulation if it received wage credits for the meals. But the failure of Bland to provide those reimbursements would be a violation of a private contract, not a violation of federal law. The H-2A regulations require only that employers promise to provide reimbursements for meals under the terms of employment contracts. 20 C.F.R. § 655.122(q). A recently promulgated regulation subjects an employer of H-2A workers to civil penalties for failure to comply with work contracts, see 20 C.F.R. § 501.19, but this regulation applies only to employers who submitted applications to hire H-2A workers on or after March 15, 2010, see

27

75 Fed. Reg. 6884, 6978 (2010). Section 203(m) provides for the protection of benefits secured by collective bargaining agreements, but it does not provide such protection to benefits secured by individual contracts. We affirm the summary judgment that Bland may receive wage credits for the meals it provided the workers.

B. *The Workers Failed to Present Evidence That Bland Approved the Collection of Fees by Manpower and Consular Services.*

The workers argue that the district court erred when it granted summary judgment in favor of Bland and against the claim of the workers that they were entitled under the Act to reimbursement for the fees that Manpower and Consular Services had charged them, but we disagree. To obtain reimbursement for these fees, the workers had to prove both that the fees may not be included in wages under section 203(m) and that Bland permitted the collection of the fees under principles of agency law. Arriaga, 305 F.3d at 1245. As in Arriaga, we need not address whether the fees are included in wages under section 203(m) because the workers failed to present substantial evidence that Bland provided Manpower and Consular Services the authority to collect those fees. See id.

"When applying agency principles to federal statutes, 'the Restatement (Second) of Agency . . . is a useful beginning point for a discussion of general

28

agency principles.'" Id. (alteration in original) (quoting Burlington Indus. v. Ellerth, 524 U.S. 742, 755, 118 S. Ct. 2257, 2266 (1998)). Under general principles of agency law, "[a]uthority is the power of the agent to affect the legal relations of the principal by acts done in accordance with the principal's manifestations of consent to him." Restatement (Second) of Agency § 7 (1958); see also Restatement (Third) of Agency §§ 2.01, 2.02 (2006). "[A]uthority to conduct a transaction includes authority to do acts which are incidental to it, usually accompany it, or are reasonably necessary to accomplish it," Restatement (Second) of Agency § 35; see also Restatement (Third) of Agency § 2.02 cmt. d, but "[a]n agent is authorized to do, and to do only, what it is reasonable for him to infer that the principal desires him to do in the light of the principal's manifestations and the facts as he knows or should know them at the time he acts," Restatement (Second) of Agency § 33; see also Restatement (Third) of Agency §§ 2.01, 2.02. Authority often "can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." Restatement (Second) of Agency § 26; see also Restatement (Third) of Agency §§ 2.02, 3.01. "Acquiescence by the principal in conduct of an agent whose previously conferred authorization reasonably might include it, indicates that the conduct was

29

authorized; if clearly not included in the authorization, acquiescence in it indicates affirmance." Restatement (Second) of Agency § 43(1); see also Restatement (Third) of Agency § 2.02 cmt. f.

The workers argue that Bland gave actual authority to Manpower and Consular Services to collect fees from them when Bland entered its agreement with International Labor, but the workers failed to present any "evidence on which the jury could reasonably find for the [workers]," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512 (1986). Bland never expressly permitted the collection of fees nor acquiesced in the collection of fees. The agreement that Bland signed made no reference to the collection of fees from workers. Lott and Yearous both testified that Wicker made assurances that workers would not have to pay any "under-the-table" charges and that the flat fee to International Labor covered all expenses. Wicker challenged this account, but Wicker also testified that he had no recollection of any discussion with representatives of Bland about any fees charged by Manpower or Consular Services. Bland understood Manpower and Consular Services to provide only assistance with the recruitment of workers, a service that Bland needed only on rare occasions and was not covered in the agency and indemnity agreements with International Labor. None of the workers ever declared the recruiting fees on the expense sheets that Bland

30

gave each worker, and none of the communications to Bland from International Labor mentioned the collection of fees from workers.

The workers argue that included in Bland's grant of authority to International Labor to secure laborers was the "responsib[ility] for collecting passports and consular fees from the prospective H-2A workers for submission to the U.S. Consulate and assisting the workers in completing their visa application paperwork," and that the collection of fees by Manpower and Consular Services for their assistance with these administrative tasks was an incident of this authority granted to International Labor, but we disagree. We rejected a similar argument in Arriaga, where an employer hired a company to manage its H-2A program and that company hired an individual in Monterrey, Mexico, to assist with the recruitment of workers. 305 F.3d at 1233–34. That individual then communicated with "contact persons" to assist with recruitment efforts in other areas of Mexico. Id. at 1234. The contact persons charged referral fees to workers hired to work for the employer, and an assistant of the individual in Monterrey also charged an administrative fee to some of the workers. Id. The workers in Arriaga argued that the employer was liable for the fees under principles of apparent authority because the "fees were payments necessary to recruit the workers." Id. at 1245. We rejected this argument because the workers had presented no evidence of any

31

"words or conduct of the [employer] which, reasonably interpreted, could have caused the [workers] to believe the [employer] consented to have the recruitment fees demanded on their behalf." Id. The workers in this appeal, like the workers in Arriaga, contend that the authority given to a party to conduct certain administrative tasks implicitly conveys authority to a third party to charge fees for assistance with those tasks. We rejected this argument in Arriaga, and we reject it here.

The workers attempt to distinguish Arriaga, but their arguments are unavailing. The workers contend that Bland is liable based on principles of actual authority, not apparent authority, which was the basis for the argument of the plaintiffs in Arriaga. This distinction is irrelevant because both actual authority and apparent authority "'depend for their creation on some manifestations, written or spoken words or conduct, by the principal, communicated either to the agent (actual authority) or to the third party (apparent authority).'" Id. (quoting Prod. Promotions, Inc. v. Cousteau, 495 F.2d 483, 493 (5th Cir. 1974), overruled on other grounds, Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702–03, 102 S. Ct. 2099, 2104–05 (1982)). The authority to conduct tasks associated with the hiring of workers does not convey a manifestation of consent to collect fees. See id. at 1245–46. The workers also attempt to

32

distinguish <u>Arriaga</u> on the ground that the employer in <u>Arriaga</u> instructed its agent not to collect fees from workers, but this distinction is irrelevant. Communications to the agent that were not learned by third parties do not affect the scope of apparent authority, so this fact did not affect the analysis of <u>Arriaga</u>. <u>See</u> Restatement (Second) of Agency § 8, illus. 3. The workers argue that International Labor failed to instruct Manpower and Consular Services not to collect fees, but the district court correctly observed that "actual authority requires the principal's manifestation of assent for the agent to take action on the principal's behalf," and International Labor's "failure to object to the collection of fees did not constitute assent by Bland Farms to those practices."

The workers also contend that Bland is liable for fees that the workers paid to Manpower and Consular Services because International Labor was aware of these fees and this knowledge is imputed to Bland, but this argument too fails. "[T]he liability of a principal is affected by the knowledge of an agent concerning a matter as to which he acts within his power to bind the principal or upon which it is his duty to give the principal information." Restatement (Second) of Agency § 272; <u>see also</u> Restatement (Third) of Agency § 5.03. The workers cite Georgia caselaw that similarly holds that "knowledge relating to the subject-matter of the agency which the agent acquires" is imputed to the principal. <u>Roylston v. Bank of</u>

Am., 290 Ga. App. 556, 560, 660 S.E.2d 412, 417 (2008) (quoting <u>Bean v. Barron</u>, 176 Ga. 285, 285–86, 168 S.E. 259, 260 (1933)). Reliance on these authorities is misplaced because, "[i]f an agent has done an unauthorized act or intends to do one, the principal is not affected by the agent's knowledge that he has done or intends to do the act." Restatement (Second) of Agency § 280; <u>see also</u> <u>Gaulding v. Courts</u>, 90 Ga. App. 472, 480, 83 S.E.2d 288, 294 (1954); Restatement (Third) of Agency § 5.03 cmt. b. Any knowledge of International Labor about the fees charged to the workers by Manpower and Consular Services is not imputed to Bland because the collection of these fees was outside the scope of authority granted by Bland. We affirm the summary judgment that Bland is not liable for the fees charged to the workers by Manpower and Consular Services.

## IV. CONCLUSION

We **AFFIRM** in part the summary judgment in favor of Bland as it pertains to the availability of wage credits for meals and Bland's liability for fees charged by Manpower and Consular Services. We **REVERSE** in part the summary judgment in favor of Bland as it pertains to the availability of wage credits for housing, and **REMAND** for further proceedings.