[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-13075
Non-Argument Calendar
_____

D.C. Docket No. 3:09-cv-01002-JBT

W.W. GAY, as Trustee of the Jacksonville
Plumbers & Pipefitters Local Union 234
Fringe Benefit Funds,
RONNY E. ANDREWS, as Trustee of
the Jacksonville Plumbers & Pipefitters
Local Union 234 Fringe Benefit Funds,
et al.,

Plaintiffs-Appellees,

versus

BRENCORP, INC., a Georgia corporation,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(February 4, 2014)

Before MARTIN, JORDAN and BLACK, Circuit Judges.

PER CURIAM:

Brencorp, Inc., an industrial contracting company, appeals the district court's entry of judgment in favor of the trustees of the Jacksonville Plumbers and Pipefitters Local Union 234 (the Union) based on Brencorp's failure to make contributions to the Union's fringe benefit funds required by a collective bargaining agreement (CBA). Brencorp argues the district court erred in deciding that Brencorp was bound by the CBA because Kenneth Welchel, the employee who signed the CBA on Brencorp's behalf, was not authorized to do so.[1] In addition, Brencorp argues the district court erred by finding that, regardless of Welchel's authority, Brencorp ratified his signing of the CBA through its conduct. Upon review, we conclude the district court did not err and affirm.

## I.    BACKGROUND

Brencorp's negotiations with the Union began after Anheuser-Busch contracted with Brencorp to install equipment at its Jacksonville, Florida, facility

---

[1] This case actually involves two CBAs. Welchel signed the first on August 3, 2007, and it expired just a few weeks later on August 31, 2007. Welchel then signed the second on September 1, 2007, and it covered the three-year period from September 1, 2007, to August 31, 2010. Because this is the period during which Brencorp failed to make the contributions at issue, the Union's claim turns on Welchel's authority to sign only the second CBA. However, because the CBAs were signed so close in time, the circumstances surrounding the signing of both CBAs inform our analysis of the scope of Welchel's authority. *See, e.g.*, Restatement (Third) of Agency § 2.02 cmt. e ("Interactions between principal and agent do not occur in a vacuum. Prior dealings between them are relevant to the reasonableness of the agent's understanding of the principal's manifestation."); Restatement (Second) of Agency § 34 cmt. b ("If an agent has been previously employed, ordinarily he is entitled to assume that he is authorized to continue to do what he has been doing with the knowledge of the principal without objection from him.")

2

beginning on August 6, 2007.[2]  On August 1, 2007, Ted Brennan, Brencorp's president and sole executive officer, sent a letter to the Union proposing to staff the project with union labor and pay wages and benefits according to the Union's CBA.  However, Brennan proposed that the agreement would self-terminate upon the project's completion, whereas the Union preferred Brencorp to agree to the CBA and its standard three-year duration.  Accordingly, Jimmy Johnson, the Union's business manager, responded to Brennan's letter by sending him two copies of the CBA and asking him to sign and return one of them.  Brennan received this response on August 3, 2007, three days before the project's start date. Later that day, Brennan and Johnson had a 41-minute telephone conversation during which they reiterated their positions on whether they would enter into a one-job agreement or the standard CBA.

Brencorp assigned Welchel to the project.  Welchel was a member of the Plumbers, Pipefitters, and Service Technicians Local Union 72 based in Atlanta, Georgia who worked with Brencorp as a project supervisor.  At trial, Welchel testified to a number of facts surrounding his signing of the CBAs.

Welchel stated that he worked on the project for three-to-four weeks at Brencorp's offices in Cartersville, Georgia, before traveling to Jacksonville to supervise the project and meet with Union representatives.  At the time he traveled

---

[2] We refer to the equipment installation as "the project."

3

to Jacksonville, Welchel believed Brencorp and the Union had already reached an agreement, but Johnson told him that no agreement had been signed and that, despite Brencorp's preference for a one-job agreement, the Union would not provide labor if Brencorp did not sign a CBA.  Welchel initially told Johnson the issue was "out of [his] hands" and that he did not come to Jacksonville to sign an agreement.  Welschel testified that he subsequently spoke to Brennan about the need to sign a CBA, but Brennan "kept putting it off" until the project was soon to begin.  In the following exchange, Welchel described what happened next:

Q.    And what happened when it came down to the wire and the job was supposed to start?

A.    Well, I've had a couple of conversations with Mr. Brennan about that, you know, and I told him, I said, you know, if he doesn't sign with [the Union], then I'm not going to run the job with nonunion people.  And—you know.  Well, he knew that before I left Cartersville.

And when it came right down to when we had to actually put manpower on site, and I had talked to Mr. Brennan on that particular day, I believe it was, and, you know, I asked him, you know, "What are we going to do?  I can't hire anybody because we don't have an agreement with them."

And I believe his comments were, "Well, I'm not going to sign it.  If you want to sign it, go down there and sign it."  And so I did.

Q.    Mr. Welchel, did you believe that Mr. Brennan had authorized you to go sign the agreement?

4

A.    Yeah.  I would not have went down there on my own if I hadn't of [sic] communicated with him about it.  I would have just came back to Cartersville.

Brennan's testimony at trial concerning this exchange was substantially similar.  He testified, "I told Mr. Welchel that I'm not signing an agreement.  You do it if you want."  He then elaborated, testifying, "I said, 'I'm not signing the agreement.  You go fucking sign it if you want to.'"  Contrary to Welchel's testimony, Brennan testified that because he only needed three workers for the first month of the project, "[t]here was no press on time."

Welchel signed the CBA on August 3, 2007.  However, the CBA's three-year term was set to expire only 28 days after it was signed and 25 days after the project began.  Consequently, the Union asked Brencorp to sign a second CBA shortly after Welchel had signed the first.

Welchel gave conflicting testimony regarding the signing of the second CBA.  At trial, he first testified that he did not recall having a discussion with Brennan about signing the second CBA because "[i]t didn't really seem necessary" given he had just signed the first.  Welchel stated, "we had signed the [first] agreement, and that time period or that time frame of that particular agreement had run out and for us to continue working down there, we had to sign the updated agreement."  However, at his deposition Welchel stated that he told Brennan that the second CBA "[had] to be signed if we're going to keep these people out here"

5

and that Brennan responded by telling him something to the effect of "sign it if you want to." At trial, when counsel for the Union read this deposition testimony to him and asked if it refreshed his recollection, Welchel said, "Yes, it does, absolutely." He then testified that he had shown Brennan the agreement and that Brennan "kind of tossed it across the room there." Brennan agreed that he had thrown a CBA across the room but stated that he did not recall any conversations about the second CBA. He could only recall telling Welchel to sign the first CBA if he wanted to sign it and denied ever seeing that the CBAs had been signed. Brennan added that he first learned Welchel had signed the CBAs on Brencorp's behalf after the project had been completed.

Brencorp completed the project in June 2008 with Union labor and made all the benefit-fund contributions the CBA required for that labor. Brencorp later worked on other jobs covered by the second CBA without making the required contributions, prompting the Union to commence this action.

The parties consented to a bench trial before a magistrate judge. Following the bench trial, the magistrate judge made two credibility determinations. First, finding Welchel's testimony more credible than Brennan's, the magistrate judge determined that Brennan did tell Welchel to sign the second CBA if he wanted to sign it. The magistrate judge noted an inconsistency between Brennan's deposition

6

and trial testimony[3] and observed that Brennan "testified merely that he did not recall having any discussions with Welchel about Welchel signing the Second CBA" without denying that he told Welchel he could sign it. Second, the magistrate judge found that Brennan was aware Welchel signed the two CBAs at the time he signed them or shortly thereafter. The magistrate judge reiterated that he found Welchel's testimony more credible than Brennan's and also found Welchel's testimony more consistent with the surrounding circumstances. If he did not know that Welchel had signed the CBA, Brennan would have had no other explanation for the Union's sudden provision of labor after having previously insisted Brencorp sign the standard CBA. The magistrate judge concluded that Brennan was at least willfully blind to the fact that Welchel signed the CBAs.

Having made these factual findings, the magistrate judge then reached the following legal conclusions: (a) Welchel had actual authority to sign the first CBA, (b) Welchel had actual authority to sign the second CBA, and (c) Brencorp ratified Welchel's signing of the CBAs. On appeal, Brencorp argues the magistrate judge erred as to each of these conclusions.

---

[3] Specifically, Brennan testified at his deposition that he did not recall having any conversation about signing the first CBA with Welchel but, at trial, admitted that he told Welchel to "go . . . sign it if you want to."

## II.    STANDARD OF REVIEW

"After a bench trial, we review the district court's conclusions of law *de novo* and the district court's factual findings for clear error." *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1230 (11th Cir. 2009). "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted).

> "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."

*Anderson v. City of Bessemer City*, 470 U.S. 564, 573-74 (1985).

## III.    DISCUSSION

In arguing against the magistrate judge's legal conclusion, Brencorp implicitly asks us to reject several of his key factual determinations. However, we find no clear error in any of the magistrate judge's factual findings,[4] and, having thus adopted them, we agree with the resulting legal conclusions.

The magistrate judge concluded that Brencorp authorized Welchel to sign the second CBA because Brennan's "'written or spoken words or other

---

[4] The proper interpretation of the evidence is a question of fact, *see United States v. Tampas*, 493 F.3d 1291, 1298 (11th Cir. 2007), as is the determination of the reasonableness of an agent's interpretation of the principal's manifestations, *see* Restatement (Third) of Agency § 2.02 cmt. c.

8

conduct . . . , reasonably interpreted, cause[d] [Welchel] to believe that [Brennan] desire[d] him so to act.'" *Ramos-Barrientos v. Bland*, 661 F.3d 587, 600 (11th Cir. 2011) (quoting Restatement (Second) of Agency § 26). The magistrate judge based this conclusion primarily on its factual finding that Brennan told Welchel something to the effect of "sign it if you want to" and also cited a number of surrounding facts that made Welchel's belief reasonable under the circumstances. Specifically, the magistrate judge noted that Brennan made a similar statement a few weeks earlier regarding the first CBA, that the Union would pull its workers off of the project if the CBA were not signed, and that there was no evidence Brencorp had any arrangements to procure an alternative source of labor.

Brencorp asks us to interpret the evidence differently, arguing, *inter alia*, that Brennan never threw the first CBA across the room, Brennan never told Welchel to sign the second CBA, and Brennan was unaware Welchel signed the CBAs. However, Brencorp fails to demonstrate any clear error that would direct us to reject the magistrate judge's contrary factual findings. Brencorp suggests Welchel was confused during his testimony, but the magistrate judge did not find his testimony confused or otherwise inaccurate. To the contrary, the magistrate judge explicitly found Welchel's testimony more credible than Brennan's. Similarly, whereas Brencorp characterizes the magistrate judge's finding that Brennan knew Welchel signed the CBAs as a baseless assumption, Welchel's

9

testimony at trial that he showed Brennan the signed second CBA and Brennen threw it across the room shows that this finding was not clearly erroneous. *See Anderson*, 470 U.S. at 573-74.

Moreover, we agree with the magistrate judge that even if Brennan did not know Welchel signed the CBAs, his willful blindness was tantamount to knowledge. "Under the doctrine of willful blindness or deliberate ignorance, . . . knowledge can be imputed to a party who knows of a high probability of [a fact in question] and purposely contrives to avoid learning of it." *Williams v. Obstfeld*, 314 F.3d 1270, 1278 (11th Cir. 2002). Given that Brencorp and the Union were in the midst of contentious negotiations about whether Brencorp would sign a CBA, that the Union expressed great reluctance to provide labor if Brencorp did not sign the CBA, that Brennan had told Welchel (sarcastically or otherwise) to sign the CBA, that the Union then provided labor without any further negotiation, and that Brennan never asked either Welchel or the Union what had happened to resolve the CBA issue, Brennan's purported failure to learn that the CBA had been signed on Brencorp's behalf amounted to willful blindness. Thus, even if Brennan did not actually know Welchel signed the CBAs, the magistrate judge did not err in imputing such knowledge to him under a theory of willful blindness.

Accepting the magistrate judge's factual findings, we agree with the conclusion that Brennan authorized Welchel to sign the second CBA. Brennan expressly told Welchel to sign it, just as he had done a few weeks earlier with an identical CBA, [5] and Welchel's interpretation of Brennan's instructions was colored by his knowledge that the Union was unlikely to provide labor for the project if the CBA were not signed. Under these circumstances, Brennan's statement was sufficient to cause Welchel to reasonably believe Brennan wanted him to sign the CBAs, and Welchel was therefore authorized to do so. [6]

## IV.    CONCLUSION

In light of the foregoing, we hold that the magistrate judge's factual findings were not clearly erroneous, and, accepting those findings, we agree with the magistrate judge's conclusion that Welchel was authorized to bind Brencorp to the second CBA.

**AFFIRMED.**

---

[5] Brencorp makes much of the fact that, when telling Welchel he could sign the first CBA, Brennan used profanity. The magistrate judge did not interpret Brennan's use of profanity as an indication that he did not actually mean what he said, nor does Brennan's use of profanity render it implausible that he intended Welchel to sign the CBA. The magistrate judge's finding regarding Brenan's intent and the reasonableness of the conclusion Welchel drew from it is therefore not clearly erroneous.

[6] Having reached this conclusion, we have no need to decide whether Brennan ratified the signing of the second CBA through his conduct.