[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-10228
Non-Argument Calendar
_____

D.C. Docket No. 1:10-cv-21431-JAL


LEONARD SIMKOVITZ,

Plaintiff-Counter
Defendant-Appellant,

versus

JETRAN INTERNATIONAL, LTD,
a Texas Limited Partnership,
JETRAN, LLC,
a Texas limited liability company, as
General Partner of Jetran International, Ltd.,

Defendants-Counter
Claimants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(November 9, 2012)

Before HULL, MARCUS and FAY, Circuit Judges.

PER CURIAM:

After a bench trial, Plaintiff Leonard Simkovitz appeals the district court's final judgment of $22,774.21 entered against Defendants Jetran International, Ltd. and Jetran, LLC (collectively "Jetran") on Simkovitz's breach of contract claim. Plaintiff Simkovitz argues that the district court should have awarded him more damages than $22,774.21. After review, we affirm.

## I.  BACKGROUND FACTS

### A.    Purchase of Aircraft 21368 and Commission Agreement

Defendant Jetran buys and sells aircraft. Plaintiff Simkovitz was a senior vice president in Jetran's aircraft sales and leasing department. In 2003, Simkovitz helped Jetran negotiate the purchase of a Boeing 707 ("aircraft 21368"), along with four spare engines and spare parts, from the Saudi Royal Family for $680,000. For his efforts, Jetran agreed to pay Simkovitz a commission when aircraft 21368 was resold.

Specifically, Jetran agreed to pay Simkovitz a three percent commission "immediately upon the sale of" aircraft 21368, as follows:

> Pursuant to our telephone conversation dated June 19, 2003, this letter
> will confirm our agreement wherein you will be paid a three (3%)
> percent commission, paid immediately upon the sale of the above

2

referenced aircraft [Aircraft B 707-368C, MSN 21368], engines and related parts, for your efforts and intervention in the negotiation, whether the aircraft, engines and related parts are owned by Jetran International, Ltd. Or whomever Jetran assigns its ownership rights to subject aircraft, engines and parts. This commission is in addition to you current salary and other compensation and it relates solely to the above referred aircraft, engines and parts and commission shall be paid to you regardless of whoever is responsible for the subsequent sale of the aircraft, engines and parts and regardless of any commissions, if any, paid to third parties.

The contract was silent as to how to determine the value of aircraft 21368 for purposes of the commission.

Defendant Jetran intended to sell aircraft 21368 to the government of Israel. In March 2004, Jetran offered to lease the aircraft to Israel for twenty-four months at $105,000 per month and then to sell the aircraft to Israel either for $6,000,000 after twenty-four months or for $4,000,000 after forty-eight months. Israel did not accept the offer.

## B.    Swap Agreement

In 2005, Defendant Jetran entered into an agreement ("swap agreement") with Omega Air, Ltd. ("Omega") to swap aircraft 21368 for another Boeing 707 ("aircraft 21092") owned by Omega. Thus, Omega now owned aircraft 21368, and Jetran owned aircraft 21092.

The swap agreement also provided that Jetran's aircraft 21092 and another

3

Boeing 707 owned by Omega ("aircraft 20919") would be held together in storage for eighteen months with plans to try to sell them to the government of Israel. If, however, Israel agreed to buy only one of the stored 707s, Jetran and Omega agreed to share the net proceeds of the sale equally. In addition, under paragraph six of the swap agreement, Omega had the right to purchase the remaining 707 from Jetran for $500,000. After entering into the swap agreement, Jetran did not pay Simkovitz a commission.

After the swap, Omega converted aircraft 21368, which Omega now owned, to an aerial refueling tanker and leased it to the U.S. Navy in 2007. Omega also modified aircraft 20919 and sold it to the government of Israel for $8,000,000. Jetran's aircraft 21092 remained in storage. In 2010, Jetran made an unsolicited offer to sell aircraft 21092 to the Israeli Air Force for $8,500,000, but that offer was not accepted.

## C.    District Court Proceedings

Simkovitz filed this breach of contract action in federal district court. Jetran moved for summary judgment, arguing, inter alia, that the aircraft swap between Jetran and Omega was not a "sale" within the meaning of the commission agreement.

The district court denied Jetran's motion for summary judgment. The

4

district court concluded that: (1) the term "sale" in the commission agreement meant the transfer of property for either money or "other consideration"; and, thus, (2) under the terms of the contract, Simkovitz "was entitled to his three percent commission immediately upon the 'swap' of the 21368 Aircraft for the 21092 Aircraft, as the latter constitutes the 'other consideration' received by Jetran in exchange for transferring the 21368 Aircraft."

The district court then held a bench trial to determine the value of the swapped aircraft and the amount of Simkovitz's resulting commission.[1]

**D.    Bench Trial**

At trial, each party presented expert testimony as to the value of the swapped aircraft. While the parties disputed value, they did not dispute that Jetran's consideration for its sale of aircraft 21368 was (1) aircraft 21092 and (2) a fifty percent interest in the net proceeds of the sale of aircraft 20919.

Plaintiff Simkovitz's expert, Juan Serrano, is an experienced 707 pilot, flight instructor and FAA examiner, as well as a practicing aviation attorney. Serrano testified that the fair market value of aircraft 21368 and aircraft 21092 at the time of the swap was $10,000,000. Serrano's method of determining value, referred to as the "income capitalization method," was based on the amount of

---

[1]At trial, Simkovitz abandoned his claim as to the spare engines and parts.

revenue the aircraft could generate over three years.

To make his valuation using the income capitalization method, Serrano looked at Omega's 2010 agreement to lease aircraft 21368 to the U.S. Navy (worth $17,000,000), Jetran's 2004 unaccepted offer to lease and then sell aircraft 21368 to the government of Israel (worth $8,500,000) and Jetran's 2010 unaccepted offer to sell aircraft 21092 to the Israeli Air Force (for $8,500,000). Serrano then took a weighted average of the three figures, assigning twenty percent to the first figure and forty percent to the latter two figures. Serrano explained that he assigned only twenty percent to the Navy lease because he considered it "a bit of an anomaly."

Defendant Jetran's expert, Randoph DeLong, was a certified airplane appraiser. DeLong testified that, according to the Airliner Price Guide ("APG"), the fair market value of aircraft 21368 in 2005 was $770,000.[2] Specifically, using the APG, DeLong determined the base retail price for the average used 707 was $400,000. DeLong then made adjustments up and down, per the APG, based on aircraft 21368's configuration, engines, market desirability and required

---

[2]There is no merit to Simkovitz's argument that DeLong's testimony was "flawed" because he relied in part upon the APG, which was hearsay. First, the district court admitted the pages of the APG relating to 707s under the hearsay exception for market reports and other commercial publications in Federal Rule of Evidence 803(17). Simkovitz does not challenge that evidentiary ruling on appeal. Second, experts may rely on hearsay evidence in forming their opinions if it is the type of evidence reasonably relied on by experts in that particular field. See Fed. R. Evid. 703. DeLong testified that the APG was relied upon by airplane appraisers.

6

maintenance.

DeLong explained that he usually also looks at comparable sales. However, DeLong is unable to do this when, as here, the appraisal is retrospective because, although the bills of sale for the comparator aircraft are available, the maintenance records are not. DeLong testified that he uses the market approach to valuation, that the market approach is the generally accepted method for valuing an aircraft, and that he had never used the income capitalization method Simkovitz's expert had employed.

When the district court asked DeLong whether it was his opinion that the value of aircraft 21368 was $770,000, DeLong replied it was not his opinion based on "an independent analysis," but rather based on the APG's calculations and his marketplace analysis. DeLong further explained that a 707 is "an old-technology airplane" and the 2005 market for 707s was inactive. Specifically, in evaluating the market for 707s, DeLong learned that by 2005 approximately half of all 707s manufactured were retired, damaged or broken up for parts and that half of the 707s still in operation were converted to military use. In DeLong's opinion, his market research supported the 707 prices listed in the APG.

In response to the district court's further questions, DeLong noted several factors that affected the value of aircraft 21368. For example, aircraft 21368 had

7

an executive, or VIP, interior.  A 2005 buyer would probably convert the aircraft to a military use, such as a freighter, and would need to remove the interior, which reduced its value.  DeLong also noted APG adjustments for "airframe inspection time and engine heavy maintenance."

The district court asked DeLong whether he looked at offers when valuing an airplane.  DeLong responded that he did, but he generally considered them to be the highest price the seller could get for the airplane and that most of the time his actual appraised value was lower.  At the district court's request, DeLong then looked at Jetran's March 2004 offer to lease or sell aircraft 21368 to the Israeli government.  DeLong stated that he would not consider lease payments because that would involve the income approach to valuation, and that he would give the offer to sell low weight if it was not accepted.

Defendant Jetran's CEO, Morris Jaffe, testified that in 2005, Israel was one of the only buyers of Boeing 707s.  Israel used 707s as the platform for their AWAC radar planes.  Jaffe agreed that the swapped aircraft were "pretty similar." Jaffe explained that he entered into the swap agreement because he believed Israel was more likely to buy aircraft 21092 because it was a Stage 1 "Head of State" plane that was exempt from noise rules.   However, Jaffe turned out to be wrong. Israel eventually (in 2010) bought the other stored 707, aircraft 20919, for

8

$8,000,000, but only after Omega spent about $7,000,000 to prepare it for delivery. Jaffe said there was a dispute between Jetran and Omega about the net proceeds of this sale, which was not yet resolved.

Jaffe explained that the difference between the $400,000 base price in the APG and the $8,500,000 offer Jetran made to Israel was that "you have to spend a fortune on the airplane" before you give it to Israel. Therefore, Jetran's unaccepted offers to sell aircraft 21368 to Israel for approximately $8,000,000 also contemplated performing significant and expensive work on the aircraft and its engines. So, for example, Jetran's offers included a "heavy 'C' check" of the engines, which could cost as much as $2,000,000. However, the engines had come up against their "corrosion drop dead date," after which they could not "be left on wing and flown" without a complete overhaul. For this reason, Jetran's offer was merely to "start the dialogue." Jetran expected Israel to make a counteroffer demanding a complete overhaul of the engines, "fresh gear" and "different avionics." At the time of trial, Jetran still had aircraft 21092 in storage, but Jafee was still hopeful he could sell it to Israel in the future.

Jaffe also testified that under paragraph six of the swap agreement, if Israel bought only one of the stored 707s, Omega had the option to buy the remaining 707 for $500,0000 if it wanted to convert it to a refueling tanker. Jaffe agreed that

9

paragraph six put the maximum value of aircraft 21092 at $500,000.  Jaffe also agreed that Simkovitz's commission was based on the gross sale of aircraft 21368 and that any costs Jetran expended to sell aircraft 21368 would not have affected Simkovitz's commission.

Finally, Simkovitz testified that when Jetran purchased aircraft 21368 from the Saudi Royal Family in 2005, it was in "immaculate" condition.  It had only 9,000 cycles (takeoffs and landings), had been kept in a hangar in dry, non-corrosive conditions and was maintained by the Saudi Air Force.  Aircraft 21368 also had a cargo door, making it more desirable.  In contrast, a 707 operated by a commercial airline typically had over 30,000 or 40,000 cycles and would not be comparable to aircraft 21368.

At the close of trial, the district court announced its ruling from the bench. The district court found that: (1) the gross sale price for aircraft 21368 was the value of aircraft 21092 and Jetran's share in the net return on the sale of aircraft 20919 to Israel; (2) the market approach was the appropriate method for determining the value of aircraft 21092; (3) "the 500,000-dollar figure . . . contained within the swap agreement in Paragraph 6 is a fair and reasonable estimation of the value of the aircraft"; and (4) thus, Simkovitz was entitled to $15,000 in commission, plus three percent of the net return on aircraft 20919,

10

when that dispute is resolved.[3]

## E.    Final Judgment

Shortly thereafter, the district court entered a judgment that included written findings of fact and conclusions of law.  Specifically, the district court found that: (1)"[t]he 'market method' of valuation, and not the 'income capitalization method' of valuation, is more appropriate for determining that value of the consideration received in connection with the swap agreement"; (2) "[b]ased upon the testimony and evidence presented, in particular Paragraph 6 of the swap agreement, and the Court's finding that the market value of the 21092 Aircraft is the appropriate measure for determining Simkovitz's 3 percent commission, . . . $500,000 is a fair and reasonable estimation of the value of the aircraft and Simkovitz is entitled to 3 percent of this amount, or $15,000"; and (3) "Simkovitz is also entitled to a 3 percent commission of Jetran's share of the net proceeds from the sale of the 20919 Aircraft to the Government of Israel."  The district court awarded Simkovitz $22,774.21 in damages, consisting of the $15,000 commission and $7,774.21 in prejudgment interest.

## II.  DISCUSSION

---

[3]The district court also found that the "sale" occurred on June 5, 2005, the date of the bill of sale, and concluded that Simkovitz's claim was not barred by the statute of limitations.  The district court's statute-of-limitations ruling is not at issue in this appeal.

On appeal, Simkovitz contends that the district court erred in finding that the "fair market value of the 707 was $500,000 for the purpose of calculating Plaintiff's 3% commission[.]"  After review, we find no clear error in this fact finding by the district court.

We review for clear error a district court's findings of fact made following a bench trial.  Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1230 (11th Cir. 2009); see also Fed. R. Civ. P. 52(a)(6).  Clear error is a highly deferential standard of review.  "A factual finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  Morrissette-Brown v. Mobile Infirmary Med. Ctr., 506 F.3d 1317, 1319 (11th Cir. 2007) (quotation marks omitted).  Under this standard, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."  Id. (quoting Anderson v. City of Bessemer City, 470 U.S. 564, 573-74, 105 S. Ct. 1504, 1511 (1985)).  In other words, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous."  Id.  Likewise, we "must give due regard to the trial court's opportunity to judge the witnesses'

12

credibility." Fed. R. Civ. P. 52(a)(6).

Here, the district court's finding as to the value of aircraft 21092 is not clearly erroneous.[4]  As the district court noted, Omega and Jetran valued both stored 707s in their 2005 state—without any modifications or significant maintenance—at $500,000, as evidenced by paragraph 6 of the swap agreement. Jetran's CEO Jaffe testified that the $500,000 price agreed upon in paragraph six reflected the maximum value for the unmodified aircraft.  Furthermore, Jetran's expert, DeLong, explained that, per the APG, the average used 707 was valued at $400,000 in 2005.  Aircraft 21092 was not an average 707, but rather a low-cycle, low-hours VIP aircraft.  However, it is clear from the testimony of several witnesses, including Simkovitz, that the market for 707s was limited to a few countries looking to convert these aircraft to military uses and that substantial modifications and maintenance would need to occur to make the airplane marketable to these buyers.  Indeed, based on his market analysis, DeLong described the market for 707s in 2005 as inactive.  This was further shown by the fact that Jetran had difficulty selling its 707s, including aircraft 21092, which was

---

[4]We note that it is undisputed that aircraft 21092, along with a fifty percent interest in the net proceeds of the sale of aircraft 20919, was the consideration Jetran received in the aircraft swap with Omega.  Thus, it is the value of aircraft 21092 (not the value of aircraft 21368) that matters for purposes of calculating Simkovitz's commission.

13

still in storage at the time of trial in 2011.  This evidence provides ample support for the district court's finding that the value of aircraft 21092 was $500,000.

Simkovitz points to his expert's testimony that aircraft 21368 and aircraft 21092 were valued at $10,000,000 based on the revenue they could generate by being leased to a government.  However, the district court considered and rejected this testimony, and the district court's decision to do so is supported by substantial evidence.  According to DeLong, an experienced airplane appraiser, the income capitalization method Serrano used was not the generally accepted method for appraising airplanes.  Moreover, the three figures Serrano used to arrive at his valuation consisted of two unaccepted offers, which DeLong said should be given little weight, and a lease agreement that Serrano himself characterized as an anomaly.  The district court's decision to discredit Serrano's valuation using the income capitalization method was not clear error.  See United States v. Saingerard, 621 F.3d 1341, 1343 (11th Cir. 2010) (concluding that the district court did not commit clear error "in considering the conflicting expert testimony and crediting one view over the other").

Simkovitz stresses that it was undisputed that his commission was to be calculated based on the "gross sale," meaning the value of the aircraft including any modifications and regardless of the costs Jetran incurred.  However, neither

14

aircraft was modified at the time of the swap in June 2005. Jetran exchanged one unmodified 707 for another unmodified 707. Thus, the "gross sale" was for aircraft 21092, an unmodified 707.[5] For this reason, Omega's 2010 sale of aircraft 20919 to Israel for about $8,000,000—only after Omega spent $7,000,000 modifying it—is not probative evidence of the value of unmodified aircraft 21092 at the time of the swap.

The record belies Simkovitz's argument that the district court failed to consider Jetran's unaccepted offers to sell 707s to Israel. The district court heard testimony about these offers and, in fact, asked expert DeLong about them during the trial. DeLong explained that, while he sometimes considers accepted offers as the highest price a seller could receive, he gives an unaccepted offer little weight. DeLong's testimony was supported by CEO Jaffe, who explained that, given the amount of work the aircraft needed, these offers represented opening gambits to start negotiations, not the price at which Jetran expected to sell the aircraft to Israel. And, even these opening offers included heavy C checks of the engines

---

[5]We reject Simkovitz's contention that the district court's ruling modified the terms of the commission agreement. The commission agreement provided that if Jetran made costly modifications to aircraft 21368 that increased its sale price, then Simkovitz would receive three percent commission on that increased sale price. However, Jetran never made any modifications to aircraft 21368. Instead, it swapped aircraft 21368 essentially "as is" and in exchange received a similar aircraft that was also unmodified. Thus, under the terms of the commission agreement, Simkovitz was entitled to a three percent commission on that "as is" swap, not on some hypothetical sale that Jetran might have made after modifying aircraft 21368.

costing up to $2,000,000. Thus, they were not offers to sell the aircraft in the same condition that aircraft 21092 was in at the time of the swap.

For all of these reasons and given the record as a whole, Simkovitz has not shown clear error in the district court's findings in this case. Simkovitz's remaining argument that the district court's judgment lacked finality has no merit and warrants no further discussion.

**AFFIRMED.**